Earl W. SAUDER, Plaintiff-Appellant,

v.

DEPARTMENT OF ENERGY and Charles W. Duncan, Jr., Secretary of Energy, Defendants-Appellees,

and

United States of America, Counterclaimant-Appellee.

No. 10–25.

Temporary Emergency Court of Appeals.

Argued Nov. 12, 1980.

Decided April 24, 1981.

Arthur M. Meyer, Jr. and Thomas F. Holt, Jr., Washington, D. C., argued, John R. Cope and Darci L. Rock of Bracewell & Patterson, Washington, D. C., for plaintiff-appellant.

Barbara L. Ward, Washington, D. C., argued, Alice Daniel, Asst. Atty. Gen., Dennis G. Linder, C. Max Vassanelli and Stuart A. Licht, Dept. of Justice, Larry Ellsworth and Daniel Shea, Washington, D. C., Dept. of Energy, for defendants-appellees.

David J. Beck and Ronald D. Secrest of Fulbright & Jaworski, Houston, Tex., for amici curiae.

Before CHRISTENSEN, DUNIWAY and ZIRPOLI, Judges.

DUNIWAY, Judge:

Earl W. Sauder appeals from the district court's ruling that he violated the Department of Energy's mandatory pricing regulations. Affirming an order by the Department of Energy,[1] the district court concluded that Sauder was not entitled to the stripper well exemption to the ceiling price for first sales of crude oil and that Sauder was liable individually for the full amount of the overcharges. We affirm.

### I. *The Facts.*

Sauder is the part owner and operator of three oil leases located in Lyon County, Kansas—the Babinger-Perrier, the Rossillon, and the Jones-Rathke leases. These three contiguous leases are part of the Bradfield Pool, a single crude oil reservoir that has been tapped intermittently since the 1920's. In the early 1960's, production from the Pool was once again scheduled to be stopped, and Sauder and five other working interest owners were able to purchase, between 1962 and 1966, all ten of the leases covering the Pool. Acting under the authority of the Kansas Corporation Commission, Sauder and his co-owners unitized four leases to form the Babinger-Perrier lease and another four leases to form the Jones-Rathke lease. The Rossillon lease was left unchanged, and the Rossillon, Babinger-Perrier, and Jones-Rathke leases were never unitized to form a single tract.

Unitization agreements combine "the separate tracts in the field into one tract so that the reservoir may be operated without regard to surface property lines." Williams and Myers, Oil and Gas Law, volume 6, § 901, p.4. Unitization becomes particularly necessary when a reservoir has passed the stage of primary production, as was the case with the Bradfield Pool, and can only be tapped through "secondary recovery operations, where the location of input wells,

the freedom to flood out parts of the reservoir, and the sharing of costs are vital to the success of the program." *Id.*

Sauder and the other working interest owners never sought to unitize the three leases at issue in this litigation because of "the complexity of obtaining the signatures of all the royalty owners involved, including estates, trusts, and other fiduciaries." Appellant's Brief at page 6. Even so, the leases were operated after 1966 as if there were a single unit. The number of wells was reduced from twenty-five to twelve; two wells were converted to disposal wells while several wells were shut in. Special high volume "Reda" pumps were installed at 40 acre intervals, and several new wells were drilled, without regard to lease boundaries. Secondary recovery procedures were begun, including the use of settling tanks and skimming. Electricity was charged to the entire operation through a single meter, and all three leases were operated by one "pumper" employee. It is Sauder's position that because the three leases were operated as a single property, they were in fact unitized, even though there was no written unitization agreement.

In 1973, price controls were placed on the "first sale" of crude oil—i. e., "the first transfer for value by the producer or royalty owner" 10 C.F.R. § 212.72. However, "stripper" well leases were exempted from these controls, first by the Trans-Alaska Pipeline Authorization Act of 1973, 43 U.S.C. § 1651 *et seq.*, and then by the Emergency Petroleum Allocation Act of 1973, Pub.L. 93–159, 87 Stat. 627, 15 U.S.C. §§ 751 *et seq.* Section 4(e)(2)(A) of the Allocation Act (87 Stat. 632) replaced the corresponding provision in the Pipeline Act and provided an exemption from price controls for "any lease whose average daily production of crude oil for the preceding calendar year does not exceed 10 barrels per well." This provision was briefly repealed in December, 1975, by section 401(b)(1) of

---

1. The Department of Energy succeeded the Federal Energy Administration on October 1, 1977, 42 U.S.C. § 7151(a); Executive Order No. 12009, 42 Fed.Reg. 46267 (September 15, 1977). This litigation involves actions taken by the Federal Energy Administration, and we refer to the two agencies interchangeably.

the Energy Policy and Conservation Act, Pub.L. 94–163, 89 Stat. 871, 946, but was reinstated in 1976 by section 121 of the Federal Energy Administration Amendments of 1976, Pub.L. 94–385, 90 Stat. 1127, 1132–33, 15 U.S.C. § 757(i).

In *implementing the stripper well exemption*, the Federal Energy Administration (FEA) and its successor agency, the Department of Energy (DOE), defined a stripper well lease as *"a 'property' whose average daily production of crude petroleum and petroleum condensates . . . per well did not exceed 10 barrels per day. . . ."* 10 C.F.R. § 210.32(b) (emphasis added). "Property," in turn, is defined in the regulations as "The right to produce domestic crude oil, which arises from a lease or from a fee interest," 10 C.F.R. § 212.72, and the scope of the stripper well exemption thus hinges on this somewhat enigmatic definition. For a more detailed discussion of the exemption and its history, *see Energy Reserves Group, Inc. v. DOE*, Em.App., 1978, 589 F.2d 1082, 1087–91.

In an effort to dispel some of the confusion which arose as to the definition of property, not only in relation to the stripper well exemption but also as to other aspects of the price controls, the FEA issued several interpretations of the term. Ruling 1975–15, 40 Fed.Reg. 40832 (Sept. 4, 1975), emphasized that "the right to produce" is the key attribute of a property—"the property concept is one that identifies the right to produce crude oil." Because a unitized property constitutes a single right to produce, the Ruling found that the unitization of several leases creates a single "property" for purposes of the stripper well exemption:

> Often, where two or more leases have reached the declining stages of production, they are unitized (*i. e.* the operations of the several leases are combined, more efficiently to undertake enhanced recovery techniques). Such techniques usually involve the conversion of some previously producing wells to injection wells and/or the shutting-in of other wells in a coordinated overall-production effort, and for this reason some leases are left after

unitization with fewer producing wells within their geographical boundaries than before. Unitization sometimes results in one or more leases being left only with injection wells, or with no operating wells at all. Because this realignment of producing patterns, then, may result in the distorted *actual* production from any one lease comprising the unit, production from the unit is allocated to each lease based upon *imputed* production percentages. Accordingly, the agreement under which the several leases are unitized typically combines the several rights to produce crude oil that, prior to unitization, existed in the previous producers into a single right to produce crude oil now existing in the unit. Generally, therefore, since the unit agreement signifies one right to produce crude oil arising from several leases or fee interests, the unit defines the property. *Id.*

From 1973 through 1975, Sauder claimed the stripper well exemption for oil produced from the Rossillon, Jones-Rathke, and Babinger-Perrier leases. Sauder certified to the purchaser of the oil, Mobil Oil Company, that the oil was stripper well oil and thus not subject to the ceiling price for crude oil. Sauder's position was that, because the leases were operated as a unit and because production from the field considered as a unit did not exceed 10 barrels per well per day, the exemption was available to him and his fellow working interest owners.

The DOE disagreed. The agency found that because the three leases had not been formally unitized, they must be considered as three properties. When so considered, production at the Rossillon and Babinger-Perrier leases exceeded 10 barrels per well per day, placing these leases outside the stripper well exemption. The result of secondary recovery operations had been to virtually halt production from the Jones-Rathke lease while increasing the per well production from the other two leases to quantities exceeding the 10 barrel limit.

The agency issued a Notice of Probable Violation to Sauder on July 9, 1976, stating that he had overcharged Mobil Oil in the

amount of $342,589 plus interest. Following a written response by Sauder, FEA issued a Remedial Order on November 4, 1976, holding Sauder to have violated the price controls and ordering him to repay the overcharges to Mobil Oil. On April 22, 1977, the FEA Office of Exceptions and Appeals denied Sauder's appeal of the Remedial Order, and the district court affirmed the agency.[2] Sauder appeals.

## II. *The Merits.*

Sauder's appeal falls into two parts. First, he argues that he is entitled to the benefit of the stripper well exemption. Second, he argues that even if the agency properly found him in violation of the price regulations, it could not impose on him alone the obligation to refund the total amount of the overcharge when he owned only a share of the oil produced and sold at the field.

### A. *The Question of Unitization.*

In its Decision and Order, the agency ruled that Sauder's production methods did not amount to a unitization, and thus a "property," for the purposes of the stripper well exemption:

> ... the leases were neither formally unitized as a single property nor were they ever formally recognized by the Kansas Corporation Commission as a consolidated crude oil producing property. Under these circumstances, the leases could not be treated as a single unit because in the absence of a formal unitization agreement the leases constitute three rights to produce crude oil.

Sauder does not challenge the agency's finding that the leases were never formally unitized. Rather, he argues that the requirement of a formal agreement is contrary to the agency's regulations as well as to the purposes of the stripper well exemption, and amounts to a post hoc, retroactive, and procedurally invalid rulemaking.

We begin by noting the deference due to an agency when interpreting its own regulations. *Udall v. Tallman,* 1965, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616. The agency considered and rejected Sauder's claim that his organization of production at the field as if the leases had been unitized sufficed to establish a single property for purposes of the exemption. Such a conclusion is reasonable in light of the definition of property contained in the regulations, a definition not contested by Sauder. The regulations define "property" abstractly as "the right to produce ... crude oil, which arises from a lease or from a fee interest," 10 C.F.R. § 212.72; *Grigsby v. DOE,* Em.App., 1978, 585 F.2d 1069, 1085, and the agency reasonably concluded that Sauder's production methods did not by themselves demonstrate an alteration in the underlying legal rights of the various property interests in the three leases such as to create a single right to produce. Sauder has admitted that the leases were never unitized and that the royalty interest owners in the three leases never agreed to a change in their rights.

The discussion by the district court of the normal elements of a unitization agreement ably demonstrates that an agreement among working interest owners to use secondary recovery procedures without regard to lease boundaries does not affect the property rights in the leases in the same way that an agreement to unitize does. The district court noted that "Sauder has ... failed to prove that there has been any change in the three leases following the combination of production methods. He has failed to prove that royalty interest owners knew of the production methods, or agreed to the production methods, or sustained a change in royalty payments because of the production methods, or were affected either in payments or in the terms

---

**2.** Sauder also requested exception relief under 10 C.F.R. § 205.50, asserting that application of the price regulations would result in "serious hardship" and "gross inequity." The agency denied this request on December 16, 1976, and further denied Sauder's appeal of this decision

on August 26, 1977. This last decision, however, did extend the period within which Sauder was to repay the overcharges. The present case is not an appeal from the agency's denial of exception relief.

of the lease, by any participation formula. He has failed to show that the working interest owners receive payment based on any unit agreement. He has failed to show that the production allocated to each lease was in any way altered. There is no indication that there was any ratification by royalty interest owners. He has failed to show that any lease term was altered or that any lease was extended. He has failed to produce any participation formula, which is the heart of a unitization agreement. He has failed to produce any kind of agreement."

■ In contrast to Sauder's de facto production operations, a unitization agreement normally requires agreement by the holders of royalty interests in addition to the working interest owners and involves some change in the underlying property and contractual rights of the various owners, particularly through their agreement to a participation formula. The agency's finding that Sauder had not shown a unification of property rights such as might have been shown by a unitization agreement was therefore amply supported by substantial evidence.

Sauder argues that the district court upheld the agency's decision for reasons not considered by the agency. While the agency denied Sauder the exemption for lack of a formal unitization, the district court, declining to decide whether a formal unitization was necessary, held that there was not even a de facto unitization agreement between Sauder and his fellow property owners. It is a basic rule of administrative law that a court can judge agency action only on the basis of the rationale provided by the agency. However, we do not interpret the court's opinion as providing a new basis for the agency's action. Rather, in describing in some detail the typical attributes of a unitization agreement, the court merely gave further backing to the agency's finding that Sauder had not formally unitized the three leases, and to the agency's view that reference to unitization agreements in its regulations implies certain formal requirements and attributes.

Sauder argues that in Rulings 1975–15 and 1977–1, the agency indicated that the operation of a field *as if* unitized would satisfy the property definition and thus that the agency has failed to adhere to its own regulations. Sauder cites language from Ruling 1975–15, quoted *supra* at pages 5–6 of this opinion, indicating that the attributes of a unitization are declining production, the need for enhanced recovery techniques, and the realignment of producing patterns. But Sauder ignores the Ruling's continued emphasis upon the "right to produce" as the essential characteristic of a "property." He ignores as well the Ruling's explicit statement in its discussion of pre-1972 unitizations that "the unit *agreement* signifies one right to produce crude oil arising from several leases ..." (emphasis added). The Ruling's emphasis upon the "right to produce" and its reference to an "agreement" support the agency's view that adoption of secondary recovery procedures, without a unitization agreement, does not amount to a unitization and thus does not create a single property.

Nor does the Preamble to Ruling 1977–1, 41 Fed.Reg. 36172 (August 26, 1976), provide support for Sauder's position that a de facto "unitization" constitutes a single property for purposes of the exemption. Although announcing "a liberal policy with respect to the aggregation of rights to produce which will be permitted to be treated as a single 'property,' as long as a bona fide reason for the aggregation can be demonstrated by the producer," *Id.* at 36178, the Preamble also cautions that the FEA will be restrained in applying this approach retroactively:

... FEA does not regard its ability retroactively to provide for a more flexible interpretation of the term property to be unqualified. Principles of equity generally favor that those who are similarly situated received comparable treatment. In this regard, it would be particularly inappropriate for those producers which closely adhered to the regulatory definition of the term "property" to be treated much less favorably than those producers which interpreted the term in a less formal manner. *Id.* at 36176.

The agency reasonably concluded in its Decision and Order that to treat Sauder's production techniques as the equivalent of a unitization would be an unduly liberal retrospective application of the Preamble.

Finally, Sauder argues that the agency's refusal to extend the stripper well exemption to cover his case violates the intent of Congress in enacting the exemption. Sauder argues that his was just the sort of marginal operation Congress intended to keep in production through the incentive of the exemption. There is considerable force to Sauder's claim; indeed, the agency does not deny that had the field been properly unitized, the exemption would have been available to Sauder. There is no allegation that Sauder attempted to gerrymander the leaseholds or otherwise alter production for the purpose of artificially bringing the field within the exemption. Yet in first enacting the exemption in the Pipeline Act, Congress ordered that the exemption be strictly limited:

> The Congress intends that the provisions of this section will be strictly enforced and regulated by the administering agency to insure that the limited exemption of this class of wells is ... not in any way broadened....

> ....

> These regulations shall be so designed as to provide safeguards against any abuse, over-reaching or altering of normal patterns of operations to achieve a benefit under this section which would not otherwise be available....

> ....

> The Congress also intends that the regulations provide appropriate limitations and provisions in the definition of "lease" to insure that an *administratively workable system is established which does not permit abuse.* (emphasis added) Conf. Rep. No. 93–624, 93rd Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News 2417, 2523, 2532–2533 (1973).

The agency's insistence on a formal or actual unitization agreement is consistent with Congress' direction that the agency devise "an administratively workable system" that avoids abuse of the exemption, and does not exceed the agency's authority.

Sauder next argues that even if the agency's requirement of a formal unitization agreement is not in conflict with its regulations or the statutory purpose of the stripper well exemption, the requirement must still be invalidated as a post hoc or retroactive interpretation or as a procedurally invalid rulemaking. He argues that this court rejects agency interpretations of pre-existing regulations where these interpretations are not "compelled" by the regulations. Yet neither of the cases he relies upon supports this questionable proposition. In *Standard Oil Co. v. DOE*, Em.App., 1978, 596 F.2d 1029, 1052, we found that FEA's interpretation of its regulations as requiring a certain sequence of cost pass-through was reasonable but "was not compelled. The regulations could also reasonably have been construed as imposing no particular sequence of recovery." However, we did not conclude from this fact that the agency's interpretation of the regulations was necessarily invalid. Rather, we concluded only that the validity of the agency's interpretation must be judged separately from the validity of the underlying regulations. Were Sauder correct, the majority opinion would have ended at page 1052 instead of nearly twenty pages later. Moreover, in refusing to defer to the agency's last interpretation of its regulations, we emphasized in *Standard Oil* the extraordinarily confused and contradictory agency interpretations which had preceded it. There is no comparable history of agency confusion in the case at bar.

Similarly, in *Tenneco Oil Co. v. FEA*, Emp.App., 1979, 613 F.2d 298, we refuse to defer to the agency's interpretation of its regulations, not because the agency's interpretation was merely "reasonable" and "not compelled," but because the agency sought to impose an interpretation "plainly inconsistent with the language of the regulations." *Id.* at 305. In short, the agency's interpretation of the scope of the stripper well exemption and the property concept need not be "compelled" by the regulations

in order for us to uphold it. Nor do we see reason on the facts of the case to abandon the normal rule of deference to an agency's reasonable interpretation of its own regulations.

Closely related to the above argument is Sauder's contention that the agency's insistence on a formal unitization agreement is a retroactive requirement and that it would be inappropriate to apply the requirement to his case under the factors stated in *Retail, Wholesale and Department Store Union v. NLRB*, D.C.Cir., 1972, 466 F.2d 380, 390, and repeated by us in *Standard Oil, supra*, 596 F.2d at 1063–5.

However, we conclude that the agency's interpretation is not retroactive. It does not represent a "departure from well established practice" let alone an "abrupt departure." *Id.* Sauder's complaint is that the agency continues to insist that the property be actually unitized and has not taken the further step of finding "de facto" unitization to be within the exemption. A refusal to further liberalize is not the equivalent of a retroactive application of a new interpretation. If anyone has departed "from well established practice," it was Sauder in his failure to unitize the three leases.

Finally, Sauder argues that the requirement of a formal or actual unitization is a rulemaking implemented in violation of the notice and comment provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 553 *et seq.* and the Federal Energy Administration Act, 15 U.S.C. §§ 766 *et seq.* The line between rulemaking and adjudication is often blurry, but we believe that the agency's decision in this case was an adjudication and not a rulemaking. *See American Express Co. v. United States*, Cust. & Pat.App., 1973, 472 F.2d 1050, 1055. The agency's action here can best be characterized as "judicial rather than legislative," as having "an accusatory flavor ... [resulting] in some form of disciplinary action," and as "concerned with issues of fact under stated law." *Id.* The requirement of an actual unitization agreement may have helped clarify the property concept; it did not, however, reformulate the concept.

Moreover, even were Sauder correct that the agency's action is a rulemaking, the notice and comment provisions of the APA and the Federal Energy Administration Act would not be applicable in any event. Interpretive rules—i. e., "a clarification of an existing statute or regulation," *Standard Oil, supra*, 596 F.2d at 1061—are generally exempt from the notice and comment provisions of the two acts. *See Energy Reserves Group, Inc. v. DOE*, Em.App., 1978, 589 F.2d 1082, 1099. This exemption may not apply where an interpretive ruling has "substantial impact" on an industry, *but see Id.* at 1093, but Sauder has not shown any such substantial impact. "[T]he ruling in question did not represent any substantial departure from the meaning of the regulation," *Duncan v. Theis*, Em.App., 1979, 613 F.2d 305, 308, nor has Sauder shown or even alleged that the agency's order in his case substantially affects the industry as a whole. *Standard Oil, supra*, 596 F.2d at 1061. He alleges only its effect on his own operation.

### B. *Restitution.*

■ We turn to Sauder's argument that the agency and district court exceeded their authority in ordering him to refund the full amount of the overcharges. Sauder argues that because he received only a portion of the overcharge, he alone should not have been ordered to repay the full amount of $342,589 plus interest but only his share equal to $133,000.

Sauder owns a 34 percent interest in the Rossillon lease and a 41 percent interest in the Babinger-Perrier lease. Of all the working interest owners, his is by far the largest single holding. He is the sole operator of the leases and has been the animating force behind the continued production at the Bradfield Pool. Significantly, it was Sauder who certified to Mobil Oil that the output of the leases was stripper well oil subject to the exemption. It can fairly be said that it was he who caused the overcharges.

In these circumstances, we think that it is within the authority and discretion of the

agency to hold the owner-operator of a lease liable for the full amount of the overcharge. To require the agency to seek refunds from each individual property owner would place a heavy burden on the agency, limiting its ability to repair infractions of its pricing rules. Shifting the burden to one in Sauder's position of responsibility aids the task of enforcement without working unfairness.

Thus, in an analogous case, *Tenneco Oil Co. v. Federal Power Commission*, 5 Cir., 1971, 442 F.2d 489, 497, the court found that the Federal Power Commission had properly ordered Tenneco to refund all excess charges for natural gas including payments made to its co-owners and to its predecessor. Although this action was taken under the Natural Gas Act, the court's reasoning that to hold the central figure responsible for refunding the overcharges is necessary to effective enforcement is equally applicable to the action taken here. Equitable pricing is one of the important objectives of the Emergency Petroleum Allocation Act, "and this objective cannot be bogged down in an administrative quagmire." *Tenneco Oil Co., supra*, 422 F.2d at 497. Congress has explicitly given the courts "equitable power ... to set things right and order restitution," in instances of overcharging. S.Rep. No. 92–507, 92nd Cong., 1st Sess. reprinted in 2, 1971 U.S.Code Cong. & Admin.News 2283, 2291, Economic Stabilization Act of 1970, § 209, 12 U.S.C. § 1904 note, adopted by 15 U.S.C. § 754(a). The district court's order enforcing the agency's decision is fully consistent with this grant of authority.

Sauder's principal argument in response is that § 209, in providing that "the court may ... order *restitution* of moneys *received* in violations of" agency regulations, does not permit the court or the agency to order an infringer to refund moneys not actually received by that individual. Sauder argues that the common law concept of restitution does not encompass the restoration of benefits unjustly received by third parties, and that the agency and the court have undertaken to read a damage remedy into the statute.

We disagree. To begin with, even if the statute is construed strictly, it appears that the agency's action is within its grant of authority. "In equity, restitution is usually thought of as a remedy by which defendant is made to disgorge illgotten gains *or to restore the status quo*, or to accomplish both objectives." (emphasis added). Moore's Federal Practice, Vol. 5, ¶ 38.24[2]. "[A] person who has been unjustly deprived of his property or its value ... may be entitled to maintain an action for restitution against another although the other has not in fact been enriched thereby." Restatement of Restitution, § 1, comment e, page 15. Here the agency seeks only "to restore the status quo" and "to set things right." It does not seek to recover Mobil's *damages*, which may or may not be the amount of the overcharges, but asks Sauder to make restitution of the precise amount of the overcharges paid to all property owners plus interest.

Nor do we believe that Congress intended to limit the agency's and courts' power to restore overcharges. The legislative history indicates that the explicit reference to restitution in § 209 was to settle any doubt that "there was an inherent equitable power in the court to set things right and order restitution." S.Rep. No. 92–507, *supra*, reprinted in 2, 1971 U.S.Code Cong. & Admin. News 2283, 2291. There is no indication, however, that the section thereby attempts to limit the power of the courts or the agency to restitution or to a particularly strict interpretation of restitution. "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 1945, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed.2d 1332.

Thus, in *Bonray Oil Co. v. DOE*, W.D.Ok., 1978, 472 F.Supp. 899, 903–905, *aff'd*, Em. App., 1979, 601 F.2d 1191, we held that the Economic Stabilization Act, *supra*, did not forbid, by implication, an agency from ordering a refund as opposed to a court. We

held further that because the agency was neither specifically authorized nor forbidden by the Act to order refunds, the court would look to the statutory scheme and purpose to test the agency's authority. Similarly, and looking to those purposes, we now hold that it is within the agency's authority to order an owner-operator in a situation such as Sauder's to make restitution of the total overcharge. By the same reasoning and in the absence of any specific statutory prohibition, we hold that the courts may enforce such an order under authority granted by the Economic Stabilization Act—"Any such court may also issue mandatory injunctions commanding any person to comply with any such order or regulation." (§ 209) We do not grant the agency "carte blanche," *see Mobil Oil Corp. v. FPC*, 1973, D.C.Cir., 483 F.2d 1238, 1255, but merely enforce its effort sanctioned by the statute and its purposes, "to set things right."

Finally, Sauder argues that the agency acted "arbitrarily and capriciously" in rejecting his proposed repayment plan by which the overcharge would be refunded through future price reductions to Mobil. He argues further that the district court was under the misapprehension that the agency had accepted such a plan. We find no such misapprehension nor do we find that the agency acted in excess of its authority in rejecting Sauder's proposed method of repayment. Although the agency initially ordered Sauder to make immediate repayment, in the course of subsequent proceedings the agency extended the period first to 120 days and then to two years. During the two year period the leases continue to generate income and Sauder can make repayment, at least in part, out of this income. Nor has Sauder shown that he will be unable to recover from the other property owners, for example, by applying their share of the lease revenues to repayment during the two year period. Indeed, the record indicates that just the reverse is true. When Sauder placed some $143,000 into escrow in the course of his appeals as "his" share of the alleged overcharges, in fact a substantial portion of this sum was provided by his fellow working interest owners. In any case, this is not an appeal from denial of exception relief in which Sauder's claim of hardship is best considered, and on the basis of the record before us we find no abuse of agency authority in ordering Sauder to make repayment within two years.

AFFIRMED.