**UNITED STATES of America, Plaintiff,**

v.

**EXXON CORPORATION, Defendant.**

**Civ. A. No. 78–1035.**

United States District Court,
District of Columbia.

Nov. 16, 1981.

John N. Hanson, Maryann Clifford, Dept. of Justice, Dean S. Cooper, Dept. of Energy, Paul Wallach, Larry P. Ellsworth, Richard Levie, Civ. Div. Dept. of Justice, Washington, D. C., for plaintiff.

David J. Beck, Ronald D. Secrest, Fulbright & Jaworski, Houston, Tex., David R. Johnson, John M. Simpson and Maury S. Epner, Fulbright & Jaworski, Washington, D. C., and Barbara Finney, Exxon Corp., Houston, Tex., for defendant.

## MEMORANDUM OPINION

FLANNERY, District Judge.

### I. Introduction

The government ("DOE") initiated this suit to recoup overcharges in the sale of oil allegedly caused by Exxon as the operator of the Hawkins Field Unit. In August, 1980, Exxon filed this motion to dismiss, arguing that working interest and royalty owners of various tracts in the Field Unit are indispensable parties under Rule 19 of the Federal Rules of Civil Procedure. Because the court cannot obtain personal jurisdiction over most of these interest owners, Exxon maintains, the suit should be dismissed in toto, or, at a minimum, the court should limit the suit to those overcharges actually retained by Exxon. By an order of October 9, 1980, the court held Exxon's motion in abeyance pending resolution by the Temporary Emergency Court of Appeals ("TECA") in *Sauder v. DOE*, in which the district court held the agency could collect from the principal owner and operator of various properties, the entire overcharges of all oil produced from the properties. On April 24, 1981, the TECA affirmed the lower court's decision. 648 F.2d 1341. For the reasons expressed below, Exxon's motion to dismiss is denied.

### Factual Background

There are over 300 working interest owners who lease tracts in the Hawkins Field Unit, in addition to 2,200 royalty interest owners. In 1975, the leases in the Field Unit were unitized, i.e., became subject to a comprehensive recovery operation pursuant to a Unit Agreement ("UA"). The UA provides for a sharing of costs and returns from the production of oil from the field. The leaseholders also signed a Unit Operating Agreement ("UOA") with Exxon, the unit operator, which provides that Exxon will initially pay all unit expenses and will then be reimbursed for such expenses (Article 11.1, 1.17). The UOA also contains a specific provision concerning potential litigation involving unit operations. If litigation involves over $10,000, working interest owners shall assume handling of the suit unless authority is delegated to Exxon. If such delegation occurs, all costs incurred with respect to the handling or settling of the suit is an expense Exxon is entitled to be reimbursed for. In this case, both parties apparently agree that the other interest owners in the Hawkins Field Unit have *not* delegated to Exxon the authority to conduct litigation unilaterally.

In addition to being the Unit Operator of the field (actually conducting physical operations in the Unit), Exxon admits to being a 66 percent owner of the production from the unit. Thus, with respect to two-thirds of the oil, any overcharges that occurred have indisputably wound up in Exxon's pocket. With regard to the final one-third of the oil produced, it is quite unclear what Exxon's precise relationship is with the other working interests in the field. Exxon contends that it simply purchases most of the remaining oil from other interest owners (making Exxon the consumer of a total of 93.6% of the oil produced from the Field Unit), and that there is no relationship at

all between Exxon's position as field unit operator and its marketing operations with regard to oil it does not explicitly own. More importantly, Exxon rejects any contention that it has sold oil for the other interest owners, except for "miniscule" quantities that are unclaimed by "delinquent" owners. Under the UOA, Exxon suggests, the other interest owners take their share of unit production in kind (that is, in oil) and sell that share of unit production completely independently. Thus, Exxon maintains, if overcharges have occurred with respect to the oil it does not own, it has been the victim of those overcharges and not the culprit. When Exxon purchased the oil from the other interest owners, it was compelled to pay an excessive price and it had no relationship to the marketing decision of the other interest owners in pricing the oil in the first place.

The government has an entirely different view of Exxon's relationship to the oil it does not actually own. The government maintains that the other interest owners with the exception of Texaco (a five per cent interest owner) have, in fact, not taken their oil in kind and independently sold it to Exxon, but have instead allowed Exxon to retain the oil and sell it directly to other interests for a particular fee. According to this interpretation, the marketing practices of Exxon and its role as Field Unit operator are intricately linked: because Exxon is the unit operator it retains complete control over *all* the oil produced from the Field Unit (with the exception of Texaco's interest), establishes the price for *all* the oil produced from the Field Unit and essentially sells that oil for the other interest owners.

## II. *History of This and Other Relevant Litigation*

On January 10, 1978, the DOE issued a Notice of Probable Violation to Exxon, charging pricing violations in the sale of Hawkins Field Unit crude oil since 1975. The DOE alleged that Exxon, as operator of the Hawkins Field Unit, improperly characterized the unit's production as "new" oil and, therefore, the posted price for the unit exceeded the maximum allowable price under the regulations then in effect. On April 11, 1978, Exxon and several royalty interest owners filed suit in the Northern District of Texas, seeking declaratory relief on the same issues raised in the DOE's enforcement proceeding.

The United States filed this action in June, 1978, seeking to hold Exxon fully liable for all overcharges on oil sold from the Hawkins Field Unit. In June, 1979, Exxon's declaratory judgment action was transferred from the Northern District of Texas to the District of Columbia where this action was pending. *Exxon Corp. v. DOE*, No. CA–3–78–0420–D, slip op. at 4–5 (June 1, 1979). In August, 1979, Exxon and its co-plaintiffs filed notices of dismissal of the declaratory judgment action; on October 16, 1979, this court dismissed the action without prejudice.

Another suit was filed, *Jarvis Christian College v. Exxon*, in Texas state court against Exxon to recover royalty payments withheld by Exxon in anticipation of its being compelled to return overcharges in this suit. Exxon removed that case to federal court, No. TY–80–432–CA (E.D.Tex.), and attempted to join DOE. In January, 1981, this court enjoined Exxon from proceeding against DOE in the *Jarvis* suit; on appeal, the TECA stayed the *Jarvis* case until this suit is decided. *Exxon Corp. v. United States*, 4 Energy Mgt. (CCH) ¶ 26,-310 at 28,446.

As noted, the instant motion to dismiss was filed on August 28, 1980 and held in abeyance by the court's order of October 9, 1980, pending TECA's resolution of *Sauder v. DOE*. On December 5, 1980, Exxon filed a petition and counterclaim for interpleader and declaratory relief, seeking to interplead the other interest owners in the Field Unit. On February 5, 1981, this court stated that it would also await TECA's decision in *Sauder*, as well as resolution of the motion to dismiss, before ruling on the petition for interpleader.

### III. *Discussion*

Exxon's motion to dismiss is based on its claim that all interest holders in the Hawkins Field Unit are indispensable parties who cannot be joined in this action. Analysis of the joinder issue under Rule 19 must proceed on two levels: (1) whether the interest owners are persons to be joined if feasible under Rule 19(a) and (2) if they are, whether the suit must be dismissed under Rule 19(b) because these owners cannot be made parties.

#### A) *Are the Other Interest Owners Parties to be Joined if Feasible?*

Exxon argues that this suit will determine the propriety of selling prices and practices of all the over 2,200 interest owners in the Hawkins Field Unit and, therefore, all of the interest owners will be vitally impacted by the outcome of the litigation and should be part of any suit brought by DOE. Exxon maintains, therefore, that under Rule 19(a)(2)(i), the other interest owners' ability to protect their interests will, as a practical matter, be impeded or impaired by the continuation of this suit in their absence.

In the alternative, Exxon contends that it will be exposed to potential multiple liability under Rule 19(a)(2)(i) because it may be held liable for overcharges which are actually held by other interest owners. Exxon relies in this regard on its contention that it actually was the victim of overcharges because it purchased the oil from the other owners and did not participate in pricing decisions with respect to this oil. If Exxon is *not* able to achieve reimbursement from those other interest owners, the company will be exposed to multiple liability for overcharges it was not responsible for in the first place.

In addition, Exxon argues that the interest owners should be joined under Rule 19(a)(1) which provides for joinder of a party if "in his absence, complete relief cannot be accorded among those already parties." Exxon again emphasizes that it is in no way responsible for the overcharges on oil it did not own but purchased from other interest owners. Because it has not agreed to represent the other unit owners in this suit, the relief sought by the government, complete restitution of the overcharges, cannot be accorded in this suit. Thus, Exxon concludes, under Rule 19(a)(1) and both prongs of Rule 19(a)(2), the unit owners are parties to be joined if feasible.

The United States' opposition emphasizes two recent judicial decisions by TECA, one in *Sauder v. DOE*, 648 F.2d 1341, and one an interlocutory appeal from this case, *Exxon Corp. v. United States*, 4 Energy Mgt. (CCH) ¶ 26,319 at 28,446.

#### 1) *Sauder v. DOE*

In *Sauder*, the plaintiff was part owner and operator of three oil leases. The TECA affirmed an order by DOE and holding of the district court that the plaintiff had illegally claimed a stripper well exemption to the ceiling price for crude oil and could be held individually liable for the full amount of the overcharges. The court stressed that plaintiff's ownership share (ranging from 34% to 41%) was "by far the largest single holding," and that plaintiff was the sole operator of the leases. 648 F.2d at 1347. The court also emphasized that it was plaintiff who certified to purchasers that the oil was subject to the stripper exemption and thus "it can fairly be said that it was he who caused the overcharges." The court concluded that given the circumstances of the case "we think it is within the authority and discretion of the agency to hold the owner-operator of a lease liable for the full amount of the overcharge." 648 F.2d at 1348.

The government contends that *Sauder* is virtually indistinguishable from the instant case and compels rejection of Exxon's contention that complete relief cannot be accorded among those already parties. The government interprets *Sauder* as authorizing suits holding the principal owner and operator of oil producing property solely liable for overcharges on the oil produced. The United States maintains that Exxon falls within the contours of the *Sauder* decision because it owns two-thirds of the leases

in the Hawkins Field Unit and is the principal operator of the unit. The government concludes that, as in *Sauder*, it is within the discretion of the agency to charge Exxon with the full amount of the overcharges involved in this case; therefore, the other interest owners are not parties that should be joined if feasible under Rule 19(a).

Exxon, however, argues that *Sauder* does not control the disposition of the instant motion. First, according to Exxon's interpretation, TECA upheld DOE's use of a flexible administrative remedy to "restore the status quo" by compelling the principal owner-operator to furnish restitution to the party aggrieved by overcharges. In contrast, Exxon suggests, this suit does not involve review of an exercise of administrative discretion in employing flexible administrative procedures. Instead, the government has forfeited the broad deference owed its administrative processes by proceeding directly to court and seeking immediate judicial consideration of its overcharging allegations.

This distinction between *Sauder* and the instant suit is insignificant. There is nothing in *Sauder* which would suggest that the TECA would differentiate between administrative orders directing that restitution be paid and judicial enforcement actions attempting to achieve recovery of overcharges by the United States government. TECA's critical focus is on whether it is within the discretion of the agency to proceed against the principal owner-operator as a "means to repair infraction of its pricing rules." 648 F.2d at 1348. That this is so is revealed by the court's reliance on the determination in *Tenneco Oil v. FPC*, 442 F.2d 489, 497 (5th Cir. 1971) that holding "the central figure" wholly responsible for refunding overcharges is necessary to "effective enforcement" of equitable pricing regulations. 648 F.2d at 1348.

If the government can ultimately persuade the court that holding Exxon liable for the entire amount of the overcharges is necessary to the effective enforcement of the Emergency Petroleum Allocation Act, then the court must conclude that this suit, directed at Exxon alone, is within DOE's enforcement discretion. That the government has brought an enforcement action in federal court instead of proceeding through more "flexible" administrative channels is not a relevant factor in whether Exxon can be held solely liable for the overcharges and, therefore, whether joinder is desirable.[1]

The preceding discussion reveals that there is no significant distinction between *Sauder* and the instant case based simply on the *forum* DOE has chosen for attempting to recoup overcharges on oil produced from the Hawkins Field Unit. A much more substantial distinction may exist with respect to whether Exxon can be held liable in any forum for all of the overcharges on oil sold. As noted, the TECA, in *Sauder*, stressed that the owner-operator had "caused the overcharges" by certifying that all the oil sold was stripper well oil. In this case, Exxon maintains, there is no evidence it has "caused" the overcharges of oil sold by the other interest owners. In fact, Exxon contends, since Exxon is really the victim of marketing decisions made completely independently, it would be totally inconsistent with *Sauder* for the court to compel Exxon to pay restitution for overcharges on oil it did not own.

Whether this distinction articulated by Exxon in fact exists turns on which party's characterization of the marketing practices at the Hawkins Field Unit is correct. Exxon contends that the marketing decisions of the other interest owners are made completely autonomously and, therefore, Exxon cannot be said to be responsible for the overcharges in any way. The government's characterization of the marketing of oil at the field unit is dramatically different.

---

1. If the government's decision to prosecute this case in federal court is somehow pertinent to the question at hand, it is worth recalling that the agency was preparing to proceed against Exxon administratively until Exxon filed its declaratory judgment action against the DOE in Texas. Exxon cannot on the one hand deliberately choose a judicial forum and on the other complain about the lack of flexible administrative mechanisms.

DOE insists that Exxon, in effect, sold oil for the other interest owners and directly set the price for all oil produced from the field unit. In the alternative, the government suggests, Exxon, as principal owner and operator of the unit, somehow influenced the representations of all interest owners that the oil produced from the unit was "new" and not "old" oil. Therefore, the government concludes, Exxon was the "animating force" behind all of the overcharges sought in this suit.

It would be premature for the court to attempt to ascertain, at this time, which of the parties' marketing scenarios more closely approximates reality. As the government notes, future discovery will surely divulge information bearing upon precisely how marketing decisions at the field unit were made. At this point, it is sufficient for the court to note that Exxon can only be held liable for overcharges which the government can document Exxon in some way "caused." If the United States cannot ultimately prove Exxon was responsible for the overcharges on oil it did not own, the court will not order that Exxon pay restitution with respect to this oil. If the government can establish that Exxon "caused" all the overcharges on oil produced from the field, either by directly selling the oil for the other interest owners or by being the "animating force" behind all the pricing decisions made in the unit, then this suit will be virtually indistinguishable from *Sauder*, and TECA's ruling in that case will be controlling precedent here.

■ Thus, while it is presently unclear whether the United States will ultimately succeed in its efforts to prove Exxon caused all of the overcharges, the analysis in *Sauder* compels rejection of Exxon's instant motion to dismiss based on inability to join necessary parties. Under Rule 19(a)(1) "complete relief" can be accorded among existing parties since such relief in this case is definitionally that which can be legitimately exacted from Exxon by the United States. Under the formulation in *Sauder*, which this court must follow, there is no risk that the court will ultimately authorize recovery of overcharges from Exxon which Exxon is not somehow responsible for. If the government fails to sustain its burden of proving that Exxon caused the overcharges with regard to oil it did not own, then no relief will be furnished by the court to the government with respect to those overcharges. If the government can prove that Exxon caused all the overcharges then *Sauder* authorizes the court to grant to the government all the relief it requested. In either event, the "complete relief" warranted by the government's proof will be accorded by the court at the culmination of the suit. *See, e.g., Ramsey v. Bomin Testing, Inc.,* 68 F.R.D. 335, 338 (W.D.Okl.1975); *Bloch v. Sun Oil Corp.,* 335 F.Supp. 190, 196 (W.D.Okl.1971).

This treatment of *Sauder* also suggests that the alternative requirements of Rule 19(a)(2) cannot be established by Exxon. Under Rule 19(a)(2)(ii), Exxon cannot be exposed to a risk of "multiple liability" because it will only be held liable once for those overcharges which it has actually been responsible for. The fact that the overcharges themselves may have wound up "in the pockets" of other interest owners is irrelevant under *Sauder's* formulation. As long as the principal owner-operator caused the overcharges, *Sauder* allows complete recovery from that party, regardless of whether it is actually in possession of the monies received pursuant to the overcharges.

Similarly, under Rule 19(a)(2)(i), the court's analysis of *Sauder* means that the interests of other unit owners in this case will not, as a practical matter, be impeded. The court's ultimate disposition of the case will find Exxon liable for those overcharges which Exxon has caused; the decision will not rule upon the actions of other interest owners and, therefore, could not be employed as precedent to hold them liable in the future. That Exxon may attempt to seek indemnification or contribution from the other interest owners for part of the overcharges the court determines Exxon has been responsible for does not alter the court's conclusion. Such a suit by Exxon

would turn upon the specific reimbursement agreements entered into by the parties, agreements not at all at issue in the instant case. Furthermore, if the disposition of this case has any effect upon a subsequent reimbursement suit by Exxon, it may be to *assist* the other·interest owners. A finding by the court that Exxon could be found *solely* responsible for all overcharges could arguably aid other interest owners in defending against a suit for contribution or indemnification. Thus, the court's interpretation of *Sauder* compels the conclusion that none of the alternative prongs of Rule 19(a) can be satisfied here and, therefore, the other interest owners are not parties that should be joined in this dispute.

### United States v. Exxon

TECA's consideration of an interlocutory appeal from this case, *United States v. Exxon*, 4 Energy Mgt. (CCH) ¶ 26,319 at 28,446, strongly supports the conclusion that the other interest owners are not indispensable parties to this controversy. The TECA expressly directed the parties to address the question of whether the *Jarvis* plaintiffs and other interest owners "should be joined under Rule 19." ¶ 26,319 at 28,450. Following consideration of the parties' argument on the joinder issue, the TECA did *not* hold that joinder should occur. Rather, the court determined that "the Jarvis plaintiffs and other interest owners should be permitted to intervene in the action if they wish to do so." ¶ 26,319 at 28,451.

That the TECA was making a deliberate determination that joinder is *not* required in this case is revealed by language in the decision stressing the broad scope of TECA's review, and the importance of expediting the current litigation. The court noted its concern that three years have elapsed since the DOE filed this suit and that two interlocutory appeals have already been taken on "procedural grounds." ¶ 26,-319 at 28,450–51. Further, the court stressed that it could employ its "extraordinary" authority under 28 U.S.C. § 1651 to "avoid waste of judicial time and resources." ¶ 26,319 at 28,451. It stretches

the imagination to believe that TECA, fully aware of Exxon's position on the joinder of other parties and overtly interested in bringing this case to a substantive resolution, blithely sidestepped the joinder issue. It is obviously much more likely that the TECA's ruling on intervention represents the court's final and definitive decision as to how the inclusion of the other interest owners should be handled in this case.

To avoid this seemingly inevitable conclusion, Exxon advances two arguments. First, Exxon maintains that TECA's ruling on intervention was based on application of the standard for intervention of right in Rule 24(a) of the Federal Rules of Civil Procedure. Since the standard for intervention of right is substantially similar to the standard for joinder under Rule 19 TECA's ruling, in fact, supports the joinder of other interest holders in this case. The flaw in this syllogism is its underlying assumption that TECA applied the standard for intervention of right. That this was not so is evidenced by the court's declaration that interest owners should be "permitted" to intervene if they wish to do so. This language appears far more consistent with the assumption that TECA was applying the standard for permissive intervention, particularly in light of the preceding discussion on TECA's awareness of the joinder issue and desire to expedite this litigation.

Second, Exxon maintains that TECA expressly declined to decide the issue of whether the other interest owners are indispensable parties to this litigation. In support of this contention, Exxon refers to a footnote in the opinion which states that one of the "legal" questions not currently before the court is whether "Exxon can be held liable for all overcharges." ¶ 26,319 at 28,452 n.3. This language does not in any way imply that the TECA was refraining from deciding the joinder issue. Rather, its notation that the issue of whether Exxon can be held solely liable for all overcharges is not ripe is completely consistent with this court's analysis of *Sauder*. If it is ultimately determined that Exxon caused the overcharges, it can be held solely liable for the

amount of the overcharges. If the government cannot establish that Exxon caused the overcharges, then it will not be held liable for the overcharges. In either case, the other interest owners are not parties that are indispensable to this litigation. TECA's acknowledgement that it is premature to decide the "legal" question of Exxon's eventual liability for overcharges on all field unit oil buttresses the conclusion that the other interest owners are not parties that should be joined to this dispute between Exxon and the United States government.

B. *Should the Court in Equity and Good Conscience Dismiss this Action if the Other Interest Owners are Parties that Should be Joined*

▮ Rule 19(b) does not mandate dismissal of an action even if parties should be joined under Rule 19(a). Dismissal is essentially discretionary; the court's focus is on the following equitable factors: (1) to what extent a judgment rendered in the party's absence might be prejudicial to him or those already parties; (2) the extent to which, by the shaping of relief, prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. Even if the court were to conclude that the other interest owners are parties that should be joined under Rule 19(a), consideration of these equitable factors would prevent the court from dismissing this action.

▮ In considering the first factor, it is significant that TECA has extended to the other interest owners an opportunity to intervene in this litigation; it is within these owners' power to protect any interest they may have in this litigation. *See Provident Tradesmens Bank & Trust Co., v. Patterson*, 390 U.S. 102, 114, 88 S.Ct. 733, 740, 19 L.Ed.2d 936 (1968). Moreover, the TECA noted that the *Jarvis* interest owners expressly represented before that tribunal that they do not consider themselves indispensable parties to this litigation. ¶ 26,319

at 28,450. Thus, it is clear that the other interest owners will not be prejudiced significantly, if at all, by not being joined to this action.

The second equitable factor, the extent to which the shaping of relief can lessen prejudice, has already been discussed in detail. The fact that the court will only hold Exxon liable for overcharges it has in some way caused represents a shaping of relief that will essentially eliminate potential prejudice to Exxon or other interest owners. This judicial course of action also bears upon the third equitable consideration. Since Exxon will only be required to pay restitution for overcharges which *Sauder* provides it can be held accountable for, any judgment rendered by this court will be adequate regardless of the other interest owners' participation in this suit.

With respect to the fourth equitable factor, it is unclear whether dismissal of this action would leave DOE with an adequate remedy in federal court in Texas. The over 2,200 other interest owners are apparently located throughout the country. It is purely a matter of conjecture whether the Texas long-arm statute would enable the government to attain jurisdiction over all of the parties Exxon contends are indispensable to this suit. Therefore, an overall weighing of the four equitable considerations enumerated in Rule 19(b) clearly favors non-dismissal of this suit.

*Conclusion*

The TECA's recent decisions in *Sauder v. United States* and *United States v. Exxon*, indicate that the other working interest and royalty owners in the Hawkins Field Unit are not parties that should be joined if feasible under Rule 19(a). Even if these owners are parties that should be joined, consideration of the equitable factors delineated in Rule 19(b) demonstrates that this suit should not be dismissed. Thus, Exxon's motion to dismiss is denied.