**CHRISTMANN & WELBORN,**
**Appellant and Cross-Appellee,**

v.

**DEPARTMENT OF ENERGY, et al.,**
**Appellees and Cross-Appellants.**

No. CA–5–79–7.
TECA Nos. 5–109, 5–110.

Temporary Emergency Court of Appeals.

Argued March 4, 1985.

Decided March 29, 1985.

Certiorari Denied Oct. 15, 1985.
See 106 S.Ct. 227.

James Craig Dodd, with whom Mary Helm and Stephen A. Ragucci, Dodd & Helm, Enid, Okl., were on brief for plaintiff/appellant Christmann & Welborn.

Larry P. Ellsworth, with whom Thomas C. Newkirk and Ellen P. Rosenberg-Blatt, U.S. Dept. of Energy, Washington, D.C., were on brief for defendants/appellees, U.S. Dept. of Energy, et al.

Before ESTES, POINTER and SEAR, Judges:

PER CURIAM.

This litigation involves the legality of charging "new oil" prices for production from the CWC Prentice Unit, a partial unitization of the Glorietta and Clearfork reservoirs.[1] The unitization became effective September 1, 1973, and covered eight leases in Yoakum and Terry Counties, Texas, all of which had production and sales of crude oil in 1972. Christmann & Welborn (C & W), a joint venture between John J. Christmann and J.M. Welborn, was the designated operator of the unit and controlled 80% of the working interest.[2]

On August 24, 1973, John Christmann was allegedly told by Duke Ligon, an official of the Department of the Interior, that for price control purposes the new Unit would be a separate and distinct "property" with a Base Period Control Level of zero, thereby permitting the entire production to be sold at "new oil" prices.[3] Appellants contend that, based on this statement —which, they assert, constituted the most authoritative advice available at that time—they decided to continue to sell pro-

---

**1.** Application of the two-tier pricing system to unitized properties is discussed in *Grigsby v. DOE,* 585 F.2d 1069 (TECA 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979), and *Pennzoil Co. v. DOE,* 680 F.2d 156 (TECA 1982), *cert. dismissed,* 459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1983).

**2.** The remaining 20% was held by the Cherry family and Bonanza Oil Company.

**3.** Christmann and Ligon (who is no longer with the government) differ over the details of this conversation. For purposes of summary judgment, however, Christmann's account must be taken as accurate.

duction to Shell Oil Company rather than enter into a processing agreement with a third party.[4]

Although it began after a period to pay the higher prices, Shell disagreed with C & W's classification of the production as new oil and in August 1974 it formally requested an interpretation from the Federal Energy Administration. In February 1975 the FEA advised Shell that the Base Period Control Level of the unitized property would be the sum of the BPCLs of the individual component leases. This response was formally published on August 29, 1975, as Ruling 1975–15, 42 Fed.Reg. 40832 (Sept. 4, 1975).[5] Nevertheless, based on C & W's prior undertaking to be responsible for certification, Shell continued to remit to C & W on the basis of "new oil" prices.

In December 1977 a Remedial Order was issued to C & W, finding that it had sold crude oil for more than the maximum lawful price and requiring it to refund these overcharges with interest. In December 1978 the Office of Hearings and Appeals entered a Decision and Order affirming, with minor modifications, the Remedial Order. On January 12, 1979, C & W and the Department of Energy entered into a Stipulation of Stay and Escrow Agreement pending judicial resolution of the dispute.

On January 31, 1979, C & W filed its complaint in this action seeking to invalidate the Order and obtain declaratory relief upholding its pricing of the Unit's production. In addition to the federal defendants, C & W also joined the other working interest owners, asking that they pay their proportionate share of any overcharges that might be determined.[6] The United States counterclaimed on behalf of the DOE, seeking to enforce the Order. In July 1981 the DOE moved for partial remand, suggesting that the portion of the Order requiring refund of overcharges to a specific refiner be remanded to the DOE for reconsideration in light of decontrol.

Proceedings were stayed pending a decision from this court in *Pennzoil Co. v. DOE*, 680 F.2d 156 (TECA 1982), *cert. dismissed*, 459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1983), regarding the validity of Ruling 1975–15. Following the opinion in *Pennzoil*, the District Court granted summary judgment in favor of the federal defendants. After a series of additional motions the District Court ultimately certified on June 22, 1984, 589 F.Supp. 576, as a final judgment that directed C & W to pay 80% of the previously determined overcharges, with interest at the rate established in the Order. The court also directed that the case be partially remanded for consideration of the proper distribution of the overcharge in the light of decontrol and that C & W account for overcharges after the cutoff date involved in the Remedial Order. C & W appealed. The governmental defendants cross-appealed.

## ISSUES

The issues on appeal, as paraphrased from C & W's brief, are as follows:

1. Is the DOE estopped from contesting C & W's pricing of production from the CWC Prentice Unit? [7]

2. May Ruling 1975–15 be applied "retroactively" in this case?

3. Did the District Court err in partially remanding this case to the agency for consideration of the appropriate remedy in light of decontrol?

4. Did the District Court err in requiring C & W to furnish an accounting for

---

4. C & W asserts that, but for this advice, it would have entered into the processing agreement and would have received higher net income than that derived from selling the production to Shell at "old oil" prices.

5. C & W asserts that it did not learn of this ruling until December 1975.

6. C & W also made claims against Shell under the Texas Consumer Protection-Deceptive Trade

Practices Act. These claims were subsequently resolved and are not before the court on this appeal.

7. C & W's challenge to the jurisdiction of this court regarding the question of estoppel is without merit. *United States v. Wickland,* 619 F.2d 75 (TECA 1980).

any overcharges after September 1, 1976?

The issues on cross-appeal, as taken from the brief of the DOE and the United States, are as follows:

1. Did the District Court err in not holding C & W as the operator who caused the overcharges liable for the full amount of those overcharges?

2. Did the District Court err by not ordering "market" interest rates?

### ESTOPPEL

■ C & W seeks to bind the DOE to a statement allegedly made by Ligon, an employee of the Department of the Interior, following the conclusion of a symposium on the then newly-adopted price control regulations. As a general proposition, of course, those dealing with governmental officials take "the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Ligon had no statutory or regulatory authority to bind the government. He was not even an official of the agency that issued or enforced the regulations, and, indeed, the regulations provided that any agency interpretation had to be in writing.[8] 6 C.F.R. § 155.2, 38 Fed.Reg. 21983 (Aug. 15, 1973), *recodified,* 10 C.F.R. § 205.2.

The Supreme Court has recently held that

"when the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other

litigant." *Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984).

C & W argues that a different standard applies if there is no threat to the public fisc, citing *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981). It does not, however, cite the Supreme Court's decision the following year in *I.N.S. v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982), where the Court noted,

"It is true that *Hansen* relied on a line of cases involving claims against the public treasury. But there was no indication that the Government would be estopped in the absence of the potential burden on the public fisc."

As was true with the immigration laws discussed in *Miranda,* the pricing regulations at issue in this litigation involved matters of broad public policy, whether or not the public fisc was directly threatened.

The Supreme Court has left open the possibility of estoppel in the event of " 'affirmative misconduct' on the part of the Government." *See I.N.S. v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973); *I.N.S. v. Miranda, supra,* 459 U.S. at 19, 103 S.Ct. at 284; *Schweiker v. Hansen, supra,* 450 U.S. at 788, 101 S.Ct. at 1471. C & W has conceded in oral argument, however, that it makes no such claim in this case.

■ In *Pennzoil v. DOE, supra,* 680 F.2d at 171, this court refused to bind the government on the basis of advice by agency employees. In the present case involving the *oral* comments made in good faith by an official of *another* agency, the same conclusion is certainly no less compelled. The District Court properly granted sum-

---

8. C & W argues that no written interpretations could in fact have been obtained and that Ligon, acting in a liaison capacity from the Department of Interior and the Department of the Treasury, was among the most knowledgeable persons in government regarding the new regulations. In essence, it contends that it got the best advice that could be obtained at the time

from any governmental source. These assertions, even if assumed as correct for purposes of the summary judgment motion, do not however support its claim of estoppel. The fallacy in C & W's position is its erroneous hypothesis that one is entitled to obtain from some governmental source an advisory opinion that will be binding on the government.

mary judgment against C & W's claim of estoppel.

## RETROACTIVITY

■ C & W claims that the lower court erred in viewing *Pennzoil v. DOE, supra,* as upholding the retroactivity of Ruling 1975–15 in its entirety. This contention is without merit. Although the specific issue in *Pennzoil* was whether, when a unit consisted of several leases that were unitized in 1973, the unit should be treated under the Ruling as the "property" for purposes of the price control regulations, implicit in that dispute was the question whether the Base Period Control Levels of the constituent leases should, as required by the Ruling, be carried over to the new property. *Pennzoil* upheld the validity of the Ruling, and the District Court in the present case properly granted summary judgment against C & W's attack upon that Ruling.

## REMAND

■ After the Remedial Order but before final judgment, crude oil was decontrolled. This constituted a dramatic change of circumstances, and the District Court did not err in partially remanding the case to the DOE for reconsideration of the remedy in the light of decontrol. The only issue to be considered by the DOE under this remand will be the proper distribution of the overcharges and interest.

## ACCOUNTING

C & W asserts that it cannot comply with the directive of the District Court requiring it to account for overcharges after September 1, 1976, the cutoff date of the period covered by the Remedial Order. There is nothing in the record or the briefs that tends to support this contention, factually or legally.

## LIMITATION OF LIABILITY

■ The District Court set aside the agency's determination requiring C & W to pay the entire amount of overcharges and instead directed that C & W be responsible only for 80% of those amounts. We agree with the federal defendants that this ruling was in error. Dealing with a similar case where the operator of the unitized tract caused the overcharges, this court stated,

"In these circumstances, we think that it is within the authority and discretion of the agency to hold the owner-operator of a lease liable for the full amount of the overcharge. To require the agency to seek refunds from each individual property owner would place a heavy burden on the agency, limiting its ability to repair infractions of its pricing rules. Shifting the burden to one in Sauder's position of responsibility aids the task of enforcement without working unfairness." *Sauder v. DOE,* 648 F.2d 1341, 1347–48 (TECA 1981).

The rule developed in *Sauder*—in which the operator owned substantially less of the working interest than does C & W here—controls this case, and on remand the District Court should in its judgment direct that C & W pay the full amount of overcharges and interest.

## INTEREST

■ The District Court acted within its discretion in deciding that prejudgment interest should be calculated in accordance with the agency's order rather than, as requested by the federal defendants, a "market" rate. Post-judgment interest shall be calculated under 28 U.S.C. § 1961.

## CONCLUSION

The order of the District Court is REVERSED insofar as it does not require C & W to account for overcharges attributable to the working interests not owned by it. In all other respects it is AFFIRMED. The costs of this appeal are taxed against C & W.