In re The DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.

W.R. MURFIN d/b/a Murfin Drilling Co. and Champlin Petroleum Company, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants.

M.D.L. 378.
Civ. A. No. 79–1258.

United States District Court,
D. Kansas.

March 27, 1995.

Miller & Chevalier, Chartered, Washington, DC, by Donald B. Craven, James P. Tuite, Daniel M. Flores, and Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, KS, by Joseph W. Kennedy, Dennis M. Feeney, for plaintiff Union Pacific Resources Co.

Paul Michael, Edward P. Levy, Judicial Litigation Div., Economic Regulatory Admin., U.S. Dept. of Energy, Washington, DC, for U.S. Dept. of Energy.

### MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on cross motions for summary judgment. Defendant Department of Energy (DOE) has moved for summary judgment on its counterclaim against plaintiff Union Pacific Resources Company, formerly Champlin Petroleum Company (UPRC). DOE requests that the court enter an order requiring UPRC to deposit into the escrow account established by the court the sum of $3,882,321 plus additional prejudgment interest accruing after December 31, 1993. Doc. 2229 (DOE's amended cross motion for summary judgment). UPRC opposes DOE's motion and seeks summary judgment in its favor on DOE's counterclaim. Doc. 2155. The court heard oral argument on the motions, has considered the voluminous briefs and is now prepared to rule.

*Introduction and Background*

This action began in 1976 with the filing of the first action by an oil producer seeking to enjoin the Federal Energy Administration, now the DOE, from enforcing Ruling 1974–29. This Ruling, and the regulations it interpreted, required the exclusion of injection wells from the well count in calculating the average daily production per well for qualification for the stripper well exemption from price controls. This court enjoined enforcement of the regulations in question, but ordered the plaintiff oil producers to deposit into escrow the difference between the stripper well price and the controlled price of crude oil affected by the injunction.

In response to the DOE's position that it would continue to enforce Ruling 1974–29 against oil producers who were not parties to the original action and who did not have the benefit of this court's injunction, other oil producers filed suit in this and other federal district courts. Similar injunction and escrow orders were entered, allowing the oil producers to charge the stripper well price and ordering the price differential escrowed. In July 1979, these cases were consolidated by the Judicial Panel on Multidistrict Litigation and were assigned to this court as M.D.L. 378. This court has presided over these consolidated cases since that time.

The Temporary Emergency Court of Appeals (TECA) upheld the validity of the regulations and Ruling 1974–29 in *In re: The Department of Energy Stripper Well Exemption Litigation,* 690 F.2d 1375 (TECA 1982), *cert. denied sub nom. Energy Reserves Group, Inc. v. Hodel,* 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983). Pursuant to TECA's mandate, the court entered judgment for DOE. At that point, the court considered the action to be, in effect, a government enforcement action under § 209 of the Economic Stabilization Act, 12 U.S.C. § 1904 note, in which the fact of overcharge had been determined and the court was faced with effecting restitution among the myriad of users of petroleum products during the relevant time period who had paid a portion of the overcharges. *See In re: The Department of Energy Stripper Well Exemption*

*Litigation,* 578 F.Supp. 586, 593 (D.Kan. 1983).

Following hearings and negotiations among the parties as to the proper distribution of the escrowed overcharge funds, the parties reached a settlement. The court approved the Final Settlement Agreement (FSA) on July 7, 1986. *See In re: The Department of Energy Stripper Well Exemption Litigation,* 653 F.Supp. 108 (D.Kan. 1986). Since the entry of the FSA, the court has issued numerous opinions adjudicating disputes among various signatories to the FSA regarding the interpretation of the FSA. The court has overseen the distribution of multi-billions in escrowed overcharges to the thousands of participants in the FSA, including oil refiners and resellers, gasoline retailers, airlines, land and water carriers, farm cooperatives, utility companies, the states and territories, and the federal government.

The FSA did not resolve the issue of any remaining liability of the parties for payment of overcharge funds into escrow. The parties to M.D.L. 378 specifically reserved their rights to litigate the issue of remaining liability for overcharges. FSA § II.A.6. A number of parties settled their liability for overcharges with DOE and have paid funds into the court's escrow for distribution via the mechanism set up by the FSA.

In September 1988, the United States of America filed a counterclaim on behalf of DOE against the remaining parties, pursuant to §§ 209 and 211 of the Economic Stabilization Act (ESA), 12 U.S.C. § 1904 note, as incorporated into section 5(a)(1) of the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 754(a)(1). The DOE's counterclaim alleges that the remaining parties have not deposited sufficient funds into the court's escrow to satisfy their overcharge liability. In previous opinions, the court has granted judgment in favor of the DOE against other oil producers. *See In re: The Department of Energy Stripper Well Exemption Litigation (Sun Company, Inc. and Oryx Energy Company v. Department of Energy),* 752 F.Supp. 1527 (D.Kan.1990), *aff'd,* 944 F.2d 918 (TECA 1991); *In re: The Department of Energy Stripper Well Exemption Litigation (Chev-*

*ron U.S.A., Inc. v. Department of Energy),* 746 F.Supp. 1452 (D.Kan.1990), *aff'd in part,* 944 F.2d 914 (TECA 1991) (reversing only the application of the United States Rule prior to February 1983); *In re: The Department of Energy Stripper Well Litigation (Mobil Oil Corp. v. Department of Energy),* 722 F.Supp. 649 (D.Kan.1989), *on reconsideration,* 739 F.Supp. 1446 (1990) (imposing operator liability).

UPRC's predecessor Champlin was the operator of, and owned a working interest in, the Arch Unit in Sweetwater County, Wyoming. The principal working interest owners were Sun Oil Company and Coastal States Oil and Gas Company. Sun and Coastal each took their production in kind and each also marketed production on behalf of other interest owners. DOE seeks to hold UPRC liable for escrow account deficiencies attributable to Arch Unit production taken in kind and sold by Sun and Coastal.

*Summary Judgment Standards*

▮ The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S..317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

▮ The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim. Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials contained in the nonmoving party's pleadings, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P.˙56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513.

▮ At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are functions of the finder of fact, not the functions of the judge when ruling on a motion for summary judgment. The evidence of the nonmoving party is to be believed. All justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 255, 106 S.Ct. at 2513–14.

*Statement of Facts*

The following facts have been set forth by UPRC and are uncontroverted unless otherwise noted.

During the period relevant to this dispute (1978–1981), UPRC's predecessor, Champlin

Petroleum Company, owned a working interest in, and was the operator of, the Arch Unit in Sweetwater County, Wyoming.

The principal working interest owners in the Arch Unit were UPRC, Sun Gas Company (Sun), Coastal States Oil & Gas Company (also referred to as Gas Producing Enterprises and Colorado Oil and Gas Company) (Coastal), El Paso Natural Gas Products Company and Featherstone Farms. In addition to these companies, several other entities had working and royalty interests in the Arch Unit. The court notes here that DOE does not claim any overcharges for the working interests of El Paso and Featherstone. The court will not discuss further these latter two working interest owners.

As operator, UPRC was responsible for managing the discovery, development, and production of crude oil on the Arch Unit. It was also responsible for maintaining books and accounts reflecting Unit production and expenses. UPRC paid various taxes and royalties on the other owners' production, for which it was reimbursed.

UPRC, as operator, was responsible for developing and producing the Arch Unit crude oil reserves. The Unit Operating Agreement provided that each working interest owner "shall take in kind its participating percentage of all unitized substances produced from Unit Wells, ..." If any working interest owner failed to take in kind its share of production, UPRC as unit operator had the right, "subject to revocation at will, to sell the same to others on a day-to-day basis." Any such sale by UPRC was "subject always to the right of the owner of such unitized substances to exercise at any time the right to take in kind or to separately dispose of its share of such production ..." Doc. 2157, Tab I, § 13.

Throughout the relevant period, Sun and Coastal exercised their rights to take in kind and market their shares of Arch Unit pro-

duction. UPRC neither received nor sold any production attributable to the shares of those interest owners.

UPRC did not enter into any customer negotiations, or other sales activities with respect to purchase agreements, for the crude oil sold by Sun and Coastal. Nor did UPRC receive any proceeds with respect to such sales.

In addition to marketing its own production shares, Sun took and sold Arch Unit production on behalf of several other entities having working or royalty interests. In the aggregate, Sun's sales on behalf of its own interest and the interests of other entities totaled approximately 40% of the Arch Unit's production. Similarly, Coastal took and marketed crude oil on behalf of a number of royalty interest owners. In the aggregate, Coastal's sales on behalf of its own interest and the interests of other entities totaled approximately 12% of the Arch Unit's production.

In Ruling 1974–29, DOE's predecessor agency, the Federal Energy Administration, declared that injection wells were not "producing wells" and could not be included in the well count for determining whether a particular property qualified for the stripper well exemption from federal price controls.

On January 26, 1978, this court declared Ruling 1974–29 unlawful. *Energy Reserves Group, Inc. v. Federal Energy Administration*, 447 F.Supp. 1135, 1151 (D.Kan.1978). Pursuant to the injunction that it had issued, the court directed any plaintiff-producer electing to charge the uncontrolled price to deposit the "stripper premium" into a special escrow account.

On March 23, 1978—two months after this court's decision—UPRC provided its purchaser, Amoco Production Company, with a written certification that the crude oil produced from the Arch Unit qualified for the stripper well exemption from price controls.[1]

---

1. As noted by DOE, this certification was not directed specifically to Amoco. The copy provided to the court (Doc. 2157, Tab J) is not addressed to any specific recipient. It is uncontroverted that UPRC mailed copies of this certification to working interest owners Sun and Coastal as well as to UPRC's purchaser Amoco.

Contrary to the position taken by UPRC, the certification does not provide that only the crude oil UPRC was selling from the Arch Unit qualified for the stripper well exemption. Rather, the certification provides "that the captioned property qualifies as stripper well property ..." *Id.*

On March 27, 1978, UPRC sent a letter to Sun and Coastal, enclosing a copy of the stripper well certification for the Arch Unit. The letter provided:

> Enclosed is [UPRC's] certification to its crude oil purchaser, dated March 23, 1978, relative to the qualification of the subject property as a stripper well property.
>
> [UPRC] has made this certification in reliance upon the recent U.S. District Court Decision in Energy Reserves Group, Inc. et al. v. F.E.A. (D.C.Kansas—January 25, 1978), which supports the inclusion of active injection wells in the calculation of average daily production for purposes of qualifying a property as a stripper well property. This Decision has been appealed by the Department of Energy; and in the event the U.S. District Court Decision is reversed, refunds to the extent of the premium collected on the basis of a stripper well price will be required.
>
> Since the basis on which [UPRC] elected to file the certification involved legal interpretation of complex rules, regulations, and the decision in the Energy Reserves Group, Inc., [UPRC] urges you to consult your own counsel as to the acceptance of the stripper price. Should you elect to collect the additional price accorded stripper production, you should make the appropriate arrangements with the purchaser of your share of the production.

> Even though you are taking your production in kind, [UPRC] has been paying royalties and taxes for your account and billing you for the sum advanced. In the event you elect to collect the premium for stripper production, as there is a possibility of refunds and since on Federal lands, the right of a lessee to suspend payment attributable to the premium on stripper production is questionable, [UPRC] requests your written instructions and indemnity from loss in making payment of royalties in accordance with such instructions. The instructions and indemnity should also cover the payment of production taxes.

Doc. 2157, Tab J.[2]

Based on records in UPRC's possession, neither Sun nor Coastal notified UPRC that it had elected to collect the stripper price. UPRC continued, therefore, to make royalty and production tax payments on their account on a controlled-price basis. UPRC provided Sun and Coastal with notice of that practice by sending them monthly crude run statements and accounting invoices reflecting their in-kind production shares and the associated royalty and tax payments. The monthly notices indicated that the payments were based on the controlled price. None of the interest owners ever advised UPRC that the monthly notices were in error.

After this court entered its injunction, DOE announced that it intended to continue

---

2. UPRC also sent a similar letter to the working interest owners on the Boxer Unit when it certified that property as stripper, even though those interest owners did not take their oil in kind. In that letter UPRC wrote:

Enclosed is [UPRC's] certification to the crude oil purchaser dated March 23, 1978, relative to the qualification of the subject property as a stripper well property.

[UPRC] has made this certification in reliance upon the recent U.S. District Court Decision in Energy Reserves Group, Inc. et al. v. F.E.A. (D.C. Kansas—January 25, 1978), which supports the inclusion of active injection wells in the calculation of average daily production for purposes of qualifying a property as a stripper well property. This Decision has been appealed by the Department of Energy; and in the event the U.S. District Court Decision is reversed, refunds to the extent of the premium collected on the basis of a stripper well price will be required.

Since there may be refunds, [UPRC] requests your written concurrence that you desire to collect the stripper well price on your share of the production from the Unit. In this regard, the basis on which [UPRC] elected to file the certification involved legal interpretation of complex rules, regulations, and the decision in the Energy Reserves Group, Inc. case. [UPRC], therefore, urges you to consult your own counsel as to the acceptance of the stripper well price. In any event, you should be aware that it is the legal responsibility of each working interest owner to determine prices for its share of the crude oil and by offering this certification on your behalf, [UPRC] is not relieving you of this responsibility.

Doc. 2212, Exh. 1 (Deposition of Paul James Anderton, Deposition Exh. 13). UPRC has deposited into escrow all overcharges for Boxer Unit oil, and that property is not at issue here.

enforcing Ruling 1974–29 "[e]xcept to the extent [it was] specifically enjoined [from doing so] by the district court in Kansas or another court." 43 Fed.Reg. 13,093 (1978). Thus, to take advantage of this court's decision, a producer had to have been a plaintiff in the original litigation or had to file a subsequent lawsuit and obtain its own injunction. Many such suits were filed, and the Judicial Panel on Multidistrict Litigation consolidated and assigned them to this court. As here relevant, UPRC, Sun and Coastal were among the producers that filed lawsuits.

UPRC obtained an injunction against enforcement of Ruling 1974–29 conditioned upon depositing the stripper premium in the court's escrow account. The injunction required UPRC to:

> pay, or cause to be paid, to the Clerk of the United States District Court for the District of Kansas at Wichita, Kansas, the difference between the price received by [it] for crude oil sold pursuant to any such certification of a property as a stripper well property and the price for which such crude oil would have been sold had the same been sold pursuant to a certification of the property as a non-stripper property.

Doc. 2157, Tab L. In accordance with the injunction, UPRC deposited into the escrow account the stripper premium that it received on the Arch Unit production that it sold. UPRC did not receive any proceeds from the sales of the production shares of the other working interest owners and UPRC did not remit to the escrow account any stripper premium that the other working interest owners may have received.

In June 1980, UPRC made its initial deposit into the court-administered escrow account. That payment, which was more than $2.2 million, was intended to cover the total stripper premium obtained on the Arch Unit crude oil production that UPRC had sold since 1978. UPRC thereafter made deposits on a monthly basis of its stripper premium collections. UPRC never purported to make deposits of amounts collected on sales of Arch Unit production made by other interest owners.

Before the issuance of Ruling 1974–29, Sun routinely included injection wells in the calculation of a property's average daily production. In Sun's view, that practice conformed to the letter of the statute and furthered the legislative purpose of encouraging domestic production. When Ruling 1974–29 was issued, however, Sun stopped counting injection wells and made refunds to all affected purchasers.

With the filing of the producer lawsuits challenging Ruling 1974–29, various royalty interest owners urged Sun to resume the counting of injection wells on properties that Sun operated so that it could charge the stripper price. In some instances the interest owners threatened to file lawsuits seeking to have Sun held liable for any revenues that they lost because of the failure to count injection wells. As to the properties it operated, Sun resisted the demands of the royalty interest holders, stating that it would not count injection wells "unless and until a court overturned the ruling." Doc. 2157, Tab. C (Affidavit of Charles L. Carpenter, ¶ 3).

When this court did just that, Sun acted promptly to reinstitute its former practice. As this court has previously found, "[o]n March 3, 1978, shortly after this court's invalidation of Ruling 1974–29, Sun decided to begin counting injection wells and to hold the resulting additional revenues in suspense pending appeal." *In re: The Department of Energy Stripper Well Exemption Litigation, (Sun Company, Inc. and Oryx Energy Company v. Department of Energy),* 752 F.Supp. 1527, 1530 (D.Kan.1990), *aff'd,* 944 F.2d 918 (TECA 1991). Documents from Sun's files show that, by March 9, 1978, Sun had decided to recertify as stripper a list of 31 properties. Doc. 2157, Tab. M. The Arch Unit was not one of these properties. As a matter of company policy, Sun had decided to count injection wells in early March 1978, before it received UPRC's Arch Unit certification.

Correspondence between Sun and DOE indicates that Sun itself certified to its purchaser, The Permian Corporation, on March 27, 1978 that, based on the counting of injection wells, its production from the Arch Unit qualified for exempt stripper pricing. As noted in an August 1979 letter from Sun to

Permian, "[i]n March, 1978 Sun certified the subject property [the Arch Unit] as a stripper property." Doc. 2157, Tab N. DOE argues that Sun's stripper certification of the Arch Unit was based on UPRC's certification, and not on an independent determination by Sun that the property qualified for stripper status. This issue shall be addressed later in this opinion.

Sun filed its own lawsuit challenging Ruling 1974–29, which was consolidated with M.D.L. 378. In accordance with the terms of the preliminary injunction that it obtained, Sun transferred the stripper premium amounts that it had been holding in suspense to the court-administered escrow account.

With its initial deposit into the court-administered escrow account, Sun included work sheets setting forth a property-by-property breakdown of the stripper premiums that it had accumulated. The work sheets identified the Arch Unit as one of the properties with respect to which Sun had charged the stripper premium and made escrow deposits.

During the remainder of the regulatory period, Sun continued to "remit into escrow the incremental revenues attributable to the counting of injection wells that Sun either earned as an interest owner or handled as the holder of division orders on properties on which either Sun or another party was the operator." 752 F.Supp. at 1530. In the aggregate, Sun's deposits into the M.D.L. 378 escrow account totaled approximately $120 million. In the mid–1980s, an independent accounting firm, Grant Thornton, prepared a report setting forth, among other things, a statement of the deposits made into the court-administered escrow account. The Grant Thornton report specifically identifies the Arch Unit as one of the properties for which Sun made stripper premium deposits. Sun's Arch Unit deposits totaled approximately $2.3 million.

On September 11, 1980, Sun and DOE entered into a Consent Order that, with two express exceptions, "resolved and extinguished" all of DOE's potential claims regarding Sun's compliance with the regulations from March 6, 1987, through June 30, 1980. One of the excepted claims was the stripper well controversy. Because the matter was pending in the courts, Sun and DOE excluded it from the settlement, "agree[ing] to be bound by the final determination of the ... litigation." DOE contends that the Consent Order between Sun and DOE is irrelevant to the issue of UPRC's liability for Arch Unit overcharges.

After the courts upheld the validity of Ruling 1974–29, DOE obtained discovery from Sun to determine whether it had actually deposited sufficient funds into this court's escrow account to satisfy its overcharge liability. The government named Sun in the September 1988 counterclaim, asserting that Sun had not paid the full amount of its overcharges into escrow. DOE subsequently moved for summary judgment, seeking an order requiring Sun to deposit approximately $30.8 million plus specified interest into the escrow account established by the court. In 1990, this court granted DOE's motion for summary judgment. 752 F.Supp. 1527. In 1991, that decision was affirmed on appeal. 944 F.2d 918. Again, DOE argues that these statements are irrelevant to the issue of UPRC's liability for Arch Unit overcharges. In responding to the DOE discovery mentioned above, Sun stated that it lacked information, with respect to the Arch Unit and other properties in which it held a working interest but did not operate, as to production and sales volumes, regulatory tiers, posted prices and who determined Sun's oil could be sold as stripper oil. Sun stated that "[t]his information is in the possession of the operator of the property who does not normally provide it to Non-operators." Doc. 2212, Exh. 4. DOE's claim against Sun was attributable to overcharges only on properties that Sun certified and operated. 752 F.Supp. at 1529–30.

Through its subsidiaries, Coastal States Gas Producing Company and Gas Producing Enterprises, Inc., Coastal owned working interests in several low-volume crude oil producing properties, including the Arch Unit. When this court held in January 1978 that Ruling 1974–29 was invalid, Coastal believed that the decision was consistent with the federal statute and regulations and would be upheld on appeal. Shortly after that deci-

sion, Coastal began counting injection wells and charging the stripper premium. That decision was not made on an individual property basis but was instead a decision of general company policy applicable to all of Coastal's interests in crude oil producing properties. As noted by DOE in response, Coastal first established a general company policy that it would certify properties as stripper based on counting injection wells, and then implemented that policy by determining which ones qualified for stripper status on that basis.

In early February 1978, shortly after this court's decision enjoining Ruling 1974–29, Coastal began reviewing the secondary recovery properties in which it had an interest to identify those that qualified for stripper well treatment based on the counting of injection wells. In the following weeks, Coastal decided, based on this court's decision, to count injection wells and to charge stripper prices for the crude oil that it sold from qualifying properties. In accordance with that policy, Coastal's subsidiary, Gas Producing Enterprises, certified on March 31, 1978 to its purchaser, Phillips Petroleum Company, that its Arch Unit production qualified for stripper pricing status. DOE argues that Coastal's stripper certification of the Arch Unit was based on UPRC's certification, and not on an independent determination by Coastal that the property qualified for stripper status. This issue shall be addressed later in this opinion.

After DOE announced that it would continue to enforce Ruling 1974–29 against any producer not specifically covered by an existing or future injunction, Coastal took immediate steps to obtain its own injunction. On April 7, 1978, Coastal filed a lawsuit in federal district court in Delaware seeking declaratory and injunctive relief against the enforcement of Ruling 1974–29. The lawsuit encompassed Coastal's potentially affected properties in several specifically identified states, including Wyoming, the location of the Arch Unit. The action was later transferred to Kansas and consolidated with M.D.L. 378.

After an enforcement audit by the agency, DOE and Coastal entered into a global Consent Order in 1981 that, with the exception of certain specified matters, settled "all ... issues, disputes, claims, and causes of action, whether or not heretofore raised or asserted, by or between the Department of Energy and The Coastal Corporation or its subsidiaries or affiliates, relating to Coastal's compliance with the federal petroleum price and allocation regulations" from August 19, 1973 through October 31, 1980. Doc. 2157, Tab Q. One of the specified exceptions was the stripper well dispute—"the subject matter at issue in *Coastal States Gas Corporation, et al. v. DOE*, No. 78–133 (D.Del.), consolidated in *In re: The Department of Energy Stripper Well Exemption Litigation*, MDL No. 378 (D.Kan.)." *Id.* DOE and Coastal chose to resolve that dispute in a special agreement reflected in two side letters executed on the same day as the Consent Order.

The first side letter (the "Audit Letter") explained that the DOE audit covered "Coastal's certification and pricing of crude oil, including ... Coastal's determinations of the eligibility of properties for stripper well property treatment...." Doc. 2157, Tab R. As noted by DOE, this audit included only properties operated by Coastal and did not include the Arch Unit. Doc. 2213 (Declaration of John Wesner), ¶ 14.

The second letter (the "Letter of Understanding") set forth the terms under which the parties agreed to settle all matters related to Coastal's counting of injection wells. Doc. 2157, Tab S. As noted by DOE, this agreement involved only liability of Coastal to DOE and contained no provision for payments attributable to the Arch Unit. DOE argues that this agreement is irrelevant to UPRC's liability for overcharges on the Arch Unit.

The parties agreed that, pending final resolution of M.D.L. 378, DOE would not challenge Coastal's practice of counting injection wells. But they also specified that, if Ruling 1974–29 were ultimately upheld, "Coastal's liability for improperly so counting injection wells during the period covered by the Consent Order [August 19, 1973 through October 31, 1980]" would "be limited to $215,000, the amount of such liability determined by DOE during its audit ... plus interest." Doc. 2157, Tab S. The $215,000 amount deter-

mined in the audit was attributable only to properties operated by Coastal, and did not include any amounts for overcharges on the Arch Unit.

For the period not covered by the Consent Order (after October 31, 1980), Coastal agreed to maintain a detailed accounting of the stripper premium it collected. "This amount shall be treated as a constructive fund to which there will be added interest compounded quarterly...." *Id.* If DOE prevailed in the litigation, Coastal would have to refund both the $215,000 with accrued interest, and the constructive fund amount with interest for the post-October 1980 period. Coastal also agreed to be subject to a verification audit to determine its correct liability for the period after October 31, 1980. *Id.* Overcharges occurred on Coastal's share of the oil on the Arch Unit subsequent to October 31, 1980 (Doc. 2213, ¶ 7(b)). However, Coastal represented that it had no liability for that period. Doc. 2157, Tab T. Coastal made no payment to DOE for Arch Unit overcharges during that period, and apparently construed its agreement with DOE as not covering Arch Unit overcharges.

After the validity of Ruling 1974–29 was upheld on appeal, DOE and Coastal executed an Implementation Agreement to carry out the earlier settlement. DOE chose not to have Coastal make deposits into the M.D.L. 378 escrow account. Rather, Coastal was directed to make the specified payments—the $215,000 plus interest and the constructive fund—directly to DOE. The Implementation Agreement also stated that Coastal would be subject to a verification audit for the post-October 1980 period. Doc. 2157, Tab T. The parties then jointly filed a Stipulation and Order of Dismissal of Coastal's stripper well case, which this court approved.

UPRC asserts that it did not know until years later whether Coastal in fact charged the stripper price on the Arch Unit production that it sold. In November 1988, UPRC wrote to Coastal, at DOE's request, asking for pricing information regarding its sales of Arch Unit production from 1978 to 1981. In July 1989, Coastal responded with a schedule setting forth the stripper prices that it had

charged. UPRC forwarded this information to DOE. DOE has noted that the prices in the schedule furnished by Coastal in July 1989 were $0.14 per barrel below the prices it received from its purchaser, Phillips Petroleum, representing a transportation charge paid by Coastal.

The following additional uncontroverted facts have been set forth by DOE in its motion for summary judgment.

UPRC operated two properties, the Boxer Unit and the Arch Unit, that it certified as stripper well properties based on the inclusion of injection wells in the well count.

On the Boxer Unit, resulting overcharges occurred on all production, during each month beginning with February 1978 and ending with January 27, 1981.

On the Arch Unit, oil was taken and sold by UPRC, Sun and Coastal. UPRC's certification for this property, dated March 23, 1978, stated that the Arch Unit "qualifies as a stripper well property," and that for the 12–month period from January 1, 1977 through December 31, 1977 the property's average daily production was 7.54 barrels. UPRC provided Sun and Coastal each with a copy of this certification. Sun and Coastal each issued its own certification, dated March 27, 1978 and March 31, 1978, respectively, stating that the Arch Unit qualified as a stripper well property and had an average daily production of 7.54 barrels. DOE asserts that these certifications were based on the Arch Unit certification provided to them by UPRC. In response, UPRC argues first, that even if Sun and Coastal relied on UPRC's mathematical computation that the Arch Unit would qualify for stripper status if injection wells were included in the well count, that would not be probative of whether UPRC caused their overcharges. UPRC next argues that DOE has failed to show that Sun and Coastal based their certifications on UPRC's. The court shall address these matters later in this opinion.

Resulting overcharges occurred on 98.194% of the production from the Arch Unit commencing in March 1978[3] and continuing until January 27, 1981.

---

3. DOE had originally asserted that overcharges occurred beginning in January 1978. DOE regu-

The total amount of overcharges calculated for the Arch and Boxer Units (including oil accounted for both by UPRC and by other interest owners) was $7,399,852.

Deposits into the escrow account for these overcharges commenced in August 1979. Interest had already accrued on overcharges prior to that time.

The amounts deposited for the overcharges were less than the amounts of overcharges outstanding at the time of each deposit. Additional interest accrued during the remainder of the overcharge period on these unpaid overcharge amounts.

The escrow deposits for the overcharges totalled $6,487,952, and the unpaid overcharges totalled approximately $911,900, as of April 1981.

Subsequent to that time, interest has continued to accrue on unpaid amounts that have remained outstanding. An additional escrow deposit was made during September 1993, but was sufficient to pay only a portion of the total amount outstanding at the time of the payment.

Using the interest rates set forth in DOE's Policy Statement on Interest, 46 Fed.Reg. 21,412 (1981), and, for the period subsequent to January 1983, the United States Rule that deposits are applied first to interest, UPRC's remaining liability (with interest as of December 31, 1993) totals $3,882,321, according to DOE's calculations and given the revision noted in DOE's reply brief (Doc. 2230).

*Discussion*

UPRC certified two properties as stripper based on injection wells, the Arch Unit and the Boxer Unit. UPRC has paid into escrow the full amount owed on the Boxer Unit and approximately 45% of the amount due on the Arch Unit. There is no dispute that, except for the approximately 2% taken by El Paso

and Featherstone, overcharges occurred on Arch Unit production. DOE has given UPRC credit for Sun's escrow deposits for the Arch Unit; however, those deposits were not sufficient to pay the entire amount of overcharges attributable to Sun's in-kind share of production. Coastal has made no escrow deposits for Arch Unit overcharges.

UPRC moves for summary judgment against DOE, seeking a ruling that it has paid into escrow all it owes (in fact, UPRC asserts that it has overpaid) and a dismissal of the DOE's counterclaim. Motion for Summary Judgment, Doc. 2155. DOE seeks judgment in the amount of $3,882,321.00, plus interest accruing after December 31, 1993 through the date of payment. Amended Cross-Motion for Summary Judgment, Doc. 2229.

UPRC argues that (1) the operator liability doctrine will not support the imposition of liability on it for overcharges attributable to sales of Arch Unit crude oil taken in kind and sold by the working interest owners; (2) that application of the operator liability doctrine cannot be justified on grounds of administrative convenience since (a) there were only two[4] working interest owners who charged the stripper premium and (b) DOE has had the opportunity to resolve the Arch Unit liability of those two in litigation before this court (Sun) or in a settlement dealing specifically with stripper liability (Coastal); and (3) in light of Sun's adjudicated liability and the settlement of Coastal's liability, UPRC should not be held vicariously liable for overcharges attributable to their production shares.

UPRC has noted in its brief that the *Conoco* case (pending at the time UPRC filed its brief) involved two similar legal issues: (1) the applicability of the operator liability doctrine when the production is taken in kind by

lations allowed a property to be retroactively certified for two months prior to the month in which the certification was issued, allowing a retroactive price increase. However, until the issuance of the certification, no basis existed for charging or collecting the higher price. UPRC issued its Arch Unit certification on March 23, 1978, retroactive to January 1, 1978. The Arch Unit certifications of Sun and Coastal were also retroactive. UPRC issued its Boxer Unit certifi-

cation on March 23, 1978, retroactive to February 1. Although the overcharges were effective in January and February 1978, they did not actually commence until March 1978. DOE has revised its initial calculations accordingly.

4. DOE is no longer seeking to recover overcharges based on the production taken in kind by El Paso and Featherstone.

the non-operating interest owners; and (2) DOE's burden of showing that overcharges in fact occurred as a prerequisite to prevailing on its counterclaim. The court has recently issued its opinion in the *Conoco* case. *In re: The Department of Energy Stripper Well Exemption Litigation (Conoco Inc. v. DOE )*, 874 F.Supp. 1161 (D.Kan.1994). The *Conoco* opinion resolves most of the issues presented by UPRC.

The issues set forth by DOE are: (1) whether UPRC caused the overcharges on oil produced from the Arch Unit and sold by Sun and Coastal; and (2) whether DOE's recoveries from Sun pursuant to a decision by this court in this litigation, and from Coastal pursuant to a settlement concerning that case, absolve UPRC of its liability here.

*Restitution standards and operator liability*

 The Temporary Emergency Court of Appeals (TECA)[5] has stated that restitution is a remedy by which the defendant is made to disgorge illgotten gains, or to restore the status quo, or to accomplish both objectives. *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 868 F.2d 1279, 1282 (TECA 1989); *United States v. Exxon Corp.*, 773 F.2d 1240, 1278 (TECA 1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986); *Sauder v. Department of Energy*, 648 F.2d 1341, 1348 (TECA 1981). It is not necessary that there be both unjust enrichment and injury to third parties before restitution may be ordered. *United States v. Sutton*, 795 F.2d 1040, 1061 (TECA 1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987). Thus, it is not necessary to find that the infringer actually received or benefitted from the overcharges before ordering restitution. *Citronelle–Mobile Gathering, Inc. v. Herrington*, 826 F.2d 16, 27 (TECA), *cert. denied sub nom. Chamberlain v. United States*, 484 U.S. 943, 108 S.Ct. 327, 98 L.Ed.2d 355 (1987); *Sauder*, 648 F.2d at 1348.

 The operator liability doctrine provides a means of holding the operator of a crude oil producing property liable for overcharges attributable to other interest owners on that property. *See United States v. Exxon Corp.*, 773 F.2d 1240 (TECA 1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986); *Sauder v. Department of Energy*, 648 F.2d 1341 (TECA 1981); *In re: The Department of Energy Stripper Well Exemption Litigation (Conoco Inc. v. DOE)*, 874 F.Supp. 1161 (D.Kan.1994); *In re: Department of Energy Stripper Well Exemption Litigation (Mobil v. DOE)*, 739 F.Supp. 1446 (D.Kan.1990); *In re: Department of Energy Stripper Well Exemption Litigation (Chevron v. DOE)*, 746 F.Supp. 1452 (D.Kan. 1990), *rev'd in part on other grounds*, 944 F.2d 914 (TECA 1991).

 Under the operator liability doctrine, the DOE may hold the operator of a crude oil producing property liable for the entire amount of overcharges which occurred, even though the operator may have received only a portion of the overcharges corresponding to its percentage ownership interest in the property. Operator liability has been imposed in at least two general situations: when the operator is the animating force responsible for the overcharges, or when the operator is held liable as a matter of administrative convenience. *See Sauder*, 648 F.2d at 1347–48 (sole operator certified the leases as stripper well leases and caused the overcharges); *United States v. Exxon Corp.*, 561 F.Supp. 816, 850 (D.D.C.1983), *aff'd* 773 F.2d 1240, 1270 (TECA 1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986) (requiring DOE to proceed against over 200 working interest owners and over 2200 royalty interest owners would plunge DOE into an "administrative quagmire"). Imposition of operator liability is discretionary. *See Sauder*, 648 F.2d at 1347–48.

 The operator held liable under this doctrine "is not without recourse against the other interest owners, ..." *Exxon*, 561 F.Supp. at 850. Following imposition of liability on the operator, the operator has the

---

5. Until it was abolished in 1993, TECA was the court which heard all appeals from cases arising under the Economic Stabilization Act and the Emergency Petroleum Allocation Act, including all appeals from the present multidistrict litigation. Appeals from this case now lie within the jurisdiction of the United States Court of Appeals for the Federal Circuit. 28 U.S.C. § 1295(a).

burden of pursuing each individual working interest and royalty interest owner to recover the overcharges which that interest owner received. *Sauder*, 648 F.2d at 1348. Imposition of liability on the operator does not depend on a finding that the operator is entitled to contribution for the overcharges from the other interest owners in the property. *Exxon*, 773 F.2d at 1272. A government enforcement action is not the appropriate vehicle for the determination of the operator's rights against third parties. *Id.* Thus, during the overcharge proceedings, the court does not determine the nature or extent of the operator's right to contribution or indemnity, if any. Nor does the court adjudicate the rights or liabilities of absent interest owners. *See id.* at 1271. DOE need not seek restitution from each individual working interest owner. *See Sauder*, 648 F.2d at 1347–48. Nor does the government need to prove that an attempt by the operator to recover from the interest owners would be successful. *Exxon*, 773 F.2d at 1272.

*Administrative Feasibility*

■ UPRC argues that operator liability cannot be justified on the grounds of administrative feasibility or administrative convenience. UPRC argues that there are only two potential targets of a DOE refund action—Sun and Coastal.

■ A finding of administrative infeasibility or administrative convenience is not necessary before imposing operator liability on UPRC. Operator liability may be imposed either when the operator is the animating force responsible for the overcharges or when the operator is held liable as a matter of administrative convenience. *Mobil v. DOE*, 739 F.Supp. 1446, 1447 (D.Kan. 1990). As discussed in this opinion, UPRC caused (i.e., was the animating force behind) the overcharges by Sun and Coastal. It is not necessary to find in addition that administrative convenience would be served by the imposition of operator liability.

*Applicability of Operator Liability for In–Kind Oil*

■ The primary issue raised by UPRC, whether liability may be imposed upon an operator with respect to production taken in kind by other interest owners, has recently been resolved (in favor of the DOE) in this court's opinion in *Conoco.* As the court recently discussed in the *Conoco* opinion, both TECA and this court have rejected the "in kind" argument. TECA resolved the "in kind" issue against the operator in *United States v. Exxon Corp.*, 773 F.2d 1240 (TECA 1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986). In *Exxon*, TECA specifically affirmed the district court's ruling that Exxon was liable for the share of production owned, taken in kind, and sold by Texaco. *Id.* at 1272–73.

This court's decision in *Mobil v. DOE* involved operator liability for oil taken in kind and sold by an interest owner. The court imposed liability on Mobil as operator even though Mobil had not sold all the oil or collected all the overcharges. The court held Mobil liable as operator because Mobil decided to certify the oil as stripper and obtained injunctive relief permitting the stripper certifications, and because pursuit of the interest owners would place an enormous burden on the DOE. *Mobil v. DOE*, 739 F.Supp. 1446, 1447–48 (D.Kan.1990).

The court relied on the *Mobil* decision in the recent *Conoco* opinion. The court held Conoco liable for overcharges on oil taken in kind by various working interest owners on several properties which Conoco operated. *Conoco v. DOE*, 874 F.Supp. 1161 (D.Kan. 1994).

The facts of the present case do not differ significantly from either the *Mobil* or *Conoco* case. Like the *Mobil* and *Conoco* cases, UPRC brought suit and obtained an injunction to permit it to certify as stripper a property that would not otherwise qualify for the stripper well exemption. Absent the benefit of the court's injunction, the Arch Unit would not have qualified for the stripper well exemption from price controls. Without the injunction, UPRC could not have certified the property as stripper. No overcharges could have occurred absent the stripper certifications issued by UPRC. Rather than excusing the operator, the injunction demonstrates that the operator is responsible

for the overcharges. The overcharges at issue would not have occurred otherwise. *Mobil,* 739 F.Supp. at 1448.

UPRC was the operator and held the largest interest in the Arch Unit. Sun and Coastal were interest owners who sold oil that was taken in kind from the Arch Unit. UPRC certified the property as stripper and sent its certification to Sun and Coastal. Sun and Coastal issued stripper certifications to their purchasers and received the stripper price. The stripper prices were unlawful and resulted in overcharges. These uncontroverted facts are sufficient to show that UPRC caused the overcharges on the oil sold by Sun and Coastal and that UPRC is liable for those overcharges.

UPRC understood that the injunction it obtained and the stripper certifications it issued in reliance on the injunction would provide it, Sun and Coastal with the opportunity to charge the stripper price. UPRC's letters to Sun and Coastal demonstrate that UPRC anticipated that its certification would allow Sun and Coastal to receive the stripper price for Arch Unit production. Doc. 2157, Tab J.

UPRC argues that the operator liability doctrine is inapplicable when other interest owners independently price their crude oil. UPRC further argues that the evidence in this case demonstrates that Sun and Coastal independently priced the Arch Unit production that they sold. The court rejects this argument for the reasons discussed in detail herein. Assuming the operator liability doctrine is inapplicable when the non-operating interest owners take in kind and independently price their crude oil, there is no evidence from which the court may conclude that the interest owners did independently price their crude oil. There is nothing before the court to show that Sun and Coastal charged the stripper price independent of the actions of UPRC.

UPRC argues that both Sun and Coastal made their decisions to count injection wells before they received UPRC's letter advising them of its Arch Unit certification. However, the general corporate policies of Sun and Coastal regarding the counting of injection wells did not in and of themselves cause the overcharges to occur. The court finds a key distinction between the adoption of a corporate policy regarding the counting of injection wells and the factual determination of whether the Arch Unit would qualify for stripper status under that policy. This factual determination required production data from the previous twelve months, including total production volumes and the number of days each well operated during the qualifying period. It is undisputed that, as operator, UPRC possessed this information. There is no indication in the record that Sun or Coastal possessed this information.

There is nothing in the record to indicate that Sun or Coastal had sufficient data to determine that the Arch Unit qualified for stripper well status. The record does not demonstrate that UPRC provided Sun and Coastal with such information. UPRC provided its certification to Sun and Coastal to inform them that the Arch Unit would qualify as a stripper property with the inclusion of injection wells. There is nothing in the record—other than UPRC's certification—to indicate how Sun and Coastal might have determined as a factual matter that the Arch Unit would qualify for stripper well treatment. Sun and Coastal's certifications were issued after UPRC's and contained the same figure for average daily production. There is no genuine issue of fact as to Sun and Coastal's reliance on UPRC's certification.

Sun's stripper certification of the Arch Unit was based on UPRC's certification, not on an independent determination by Sun that the Arch Unit qualified for striper status. Sun's policy for stripper well property qualification permitted the counting of injection wells only on a Sun lease or property which was operated or managed by Sun. Doc. 2214, Exh. 6. For properties in which Sun owned an interest but did not operate, such as the Arch Unit, Sun requested that the operators certify those properties as stripper based on injection wells. Doc. 2212, Exh. 3 (Exhibits to Bates Affidavit). Sun recognized that the Arch Unit was operated, and therefore certified as stripper based on injection wells, by UPRC. Doc. 2214, Exh. 7; Doc. 2212, Exh. 4. When Sun submitted a marginal property certification for the Arch Unit to Permian on August 15, 1979, to be

applicable if the courts ultimately upheld Ruling 1974–29, it did so "using the certification furnished by Champlin [UPRC]." Doc. 2157, Tab N.

DOE sought discovery from Sun on various matters, including production volumes, prices, and who determined that Sun's share of production could be sold as stripper oil for the Arch Unit and other properties in which Sun held a working interest but did not operate. Sun responded that it lacked information as to these matters. Sun further responded that this information would be in the possession of the operator and that the operator did not normally provide it to the non-operating interest owners. Doc. 2212, Exh. 4, at 12–15.

UPRC has argued that Sun understood that it was the responsible party with respect to the collection of the stripper premium on the Arch Unit production it took and sold. Sun made escrow deposits for that production. However, even if Sun is ultimately responsible (which the court does not decide here) UPRC may be held liable. This is the essence of the operator liability doctrine.

As with Sun, Coastal's stripper certification of the Arch Unit was based on UPRC's certification, not on an independent determination by Coastal that the Arch Unit qualified for striper status. Coastal established a general company policy that it would certify properties as stripper based on counting injection wells. Coastal then determined on individual properties whether they qualified as stripper on that basis.

Coastal operated a property known as the Eanes North Unit, which appears to have been the only Coastal-operated property that Coastal certified as stripper based on the counting of injection wells. Prior to certifying that property as stripper, Coastal performed an analysis of the production of that property and determining that it would qualify as stripper only by the inclusion of injection wells. Harrell Dep. at 89–91, 103–05 and Dep. Exh. 4.

Coastal asserts that its stripper certification for the Arch Unit would have been based on data in its possession and its own analysis of that data. Harrell Dep. (Doc. 2212, Exh. 5), at 75–76, 106–07. However, the record does not reflect that Coastal had the data necessary to determine whether the Arch Unit qualified for stripper treatment or that Coastal performed the requisite analysis. Coastal's witness did not remember seeing such an analysis for the Arch Unit or even whether one was performed. Nor did Coastal produce one in response to DOE's subpoena. Harrell Dep. at 106–08, 111, 121, 196. Coastal's failure to produce an analysis for the Arch Unit, while producing one for the Eanes North Unit, indicates that Coastal did not undertake an analysis for the Arch Unit.

UPRC departed from its normal practice of not providing regulatory certifications to interest owners. UPRC did provide its Arch Unit stripper certification to Sun and Coastal. UPRC did so to make them aware that the property qualified as stripper with the inclusion of injection wells. Olstad Dep. (Doc. 2212, Exh. 2), at 69, 73–75. Sun and Coastal each issued a stripper certification for the Arch Unit only after UPRC issued its certification. Overcharges occurred only after Sun and Coastal determined that the property qualified for stripper status, based on UPRC's certification.

UPRC contends that it made every effort to avoid influencing the pricing decisions of Sun and Coastal. UPRC relies on the letter it wrote to the Arch Unit interest owners (quoted above), which stated that it was the interest owner's responsibility to determine if the stripper price was to be charged. UPRC sent a similar letter to the Boxer Unit interest owners—who were not taking in kind— advising them that it was their legal responsibility to determine prices for their share of crude oil. Regardless of whether the interest owners took in kind or permitted UPRC to sell their shares of production, UPRC advised the interest owners to make their own decisions regarding the collection of stripper prices. As to the Boxer Unit interest owners, UPRC has admitted liability. The letter that UPRC sent to the Arch Unit interest owners does not absolve it of liability.

 UPRC also asserts that it did not seek to influence Sun and Coastal's pricing decisions. Intent is not an element of the

**1484**

operator liability doctrine. The operator may be held liable even if it did not intend to cause the overcharges, so long as it actually caused the overcharges.

*Effect of Sun Judgment and Coastal Settlement*

■ UPRC argues that Sun and Coastal's liability has already been discharged through a final judgment (Sun) and a settlement (Coastal). UPRC also asserts that any liability it would have as operator is vicarious and that the release of Sun and Coastal operates to release UPRC as well.

■ As the court has recently decided in the *Conoco* case, the liability of the operator is not vicarious, but is direct. UPRC may be held liable regardless of whether Sun and Coastal have been released by DOE from liability for Arch Unit overcharges. Further, the Arch Unit overcharges were not included as a part of either the Sun judgment or the Coastal settlement. The adjudication of Sun's liability and the settlement of Coastal's liability applied only to properties that Sun and Coastal operated, and not to properties in which they owned working interests, such as the Arch Unit.

DOE's counterclaim against Sun was for overcharges on properties that Sun certified and operated. 752 F.Supp. 1527, 1529–30. The judgment against Sun included only amounts attributable to Sun-operated properties and did not include overcharges for the Arch Unit. DOE's calculations have given UPRC full credit for amounts paid into the escrow for overcharges attributable to Sun.

DOE's audit of Coastal covered only properties operated by Coastal, and did not include the Arch Unit. The settlement agreement reached between DOE and Coastal did not include payments attributable to the Arch Unit. The amount paid by Coastal in settlement with DOE was for liability on properties operated by Coastal. Coastal made no payments attributable to Arch Unit overcharges.

This court has recently rejected a similar vicarious liability argument in the *Conoco* case. 874 F.Supp. at 1184–1185. As the court discussed in the *Conoco* opinion, the

same vicarious liability argument was rejected by the Temporary Emergency Court of Appeals in *United States v. Exxon Corp.*, 773 F.2d 1240, 1272 (TECA 1985). TECA likewise rejected the argument that DOE's settlements with various interest owners released the claims that DOE had asserted against Exxon as operator. *Id.* at 1276. TECA specifically rejected the claim that operator liability was vicarious, stating:

> It is readily apparent that Exxon's concern about settlements which may have been made by companies who are not parties to this litigation is in fact a concern about whether or not it will be successful in any future attempt to seek contribution or indemnity from those parties on account of any payment Exxon might make upon the judgment here. As we have previously pointed out, Exxon's liability is not a vicarious one, based upon ordinary notions of "agency." It has been found that Exxon was the "animating force" responsible for violating the crude oil pricing regulations, and this liability is not dependent upon a finding of "joint liability" on the part of third parties who are not defendants in this action, or upon proof of Exxon's right to contribution or indemnity from those third parties.

*Id.* at 1276–77.

UPRC's liability as operator is not vicarious or derivative. The adjudication of Sun's liability and the settlement of Coastal's liability do not preclude DOE from pursuing UPRC for overcharges on Sun's and Coastal's shares of Arch Unit production. As noted above, imposition of liability on the operator does not depend on whether the operator has already recovered from the interest owners or will be able to recover from the interest owners. The operator liability doctrine places the risk upon the operator, and not the DOE, to pursue any claims against the interest owners who received the overcharges. Coastal anticipates that UPRC will seek indemnification from it if liability is imposed on UPRC for Arch Unit overcharges. *See* Doc. 2224 (Motion by Coastal for leave to file memorandum as amicus curiae). The notification UPRC sent to both Sun and Coastal (*supra* pp. 1473–1474) put them

on notice that UPRC would be seeking indemnification if the decision of this court in the *Energy Reserves Group* case was reversed on appeal. Indemnification from Sun and Coastal appears to be UPRC's only potential remedy for the liability UPRC incurs here on stripper well oil sold by Sun and Coastal from the Arch Unit.

*Computation issues and prejudgment interest*

■■■■ DOE seeks prejudgment interest at interest rates based on DOE's Policy Statement on Interest, 46 Fed.Reg. 21,412 (April 10, 1981). Normally, an award of restitution under ESA § 209 will include prejudgment interest. *Lea Exploration, Inc. v. Department of Energy,* 843 F.2d 510, 513 (TECA 1988). The standards for awarding prejudgment interest must be applied consistently, "since one of the principal reasons for the establishment of the Temporary Emergency Court of Appeals was Congress' intent that there be consistency throughout the United States for cases decided under the ESA." *Id.*

TECA has upheld this court's application of DOE's policy rates in the present case. *In re: The Department of Energy Stripper Well Exemption Litigation (Chevron U.S.A., Inc. v. Department of Energy),* 944 F.2d 914 (TECA 1991); *In re: The Department of Energy Stripper Well Exemption Litigation (Oryx Energy Company v. Department of Energy),* 944 F.2d 918 (TECA 1991). The court shall continue to use the DOE's policy rates. The United States Rule, that in applying partial payments to an interest bearing debt which is due, the payment should first be applied to the interest due, shall apply to payments due after January 1983. *In re: The Department of Energy Stripper Well Exemption Litigation (Chevron U.S.A., Inc. v. Department of Energy),* 944 F.2d 914, 917 (TECA 1991).

DOE revised its calculations to account for UPRC's retroactive certification of the Arch Unit. These new calculations delay the commencement of interest on overcharges attributable to properties which UPRC retroactively certified as stripper. Second Wesner Declaration, Doc. 2231, ¶ 6.

■■■ UPRC has filed a motion for leave to supplement the record regarding interest computation issues (Doc. 2237). DOE has calculated interest on Coastal, Sun and UPRC's overcharges beginning with the month following the month of sale. UPRC argues that, since it did not receive payment of the stripper premiums during the month of sale, interest should not begin to accrue until the month after actual receipt of payment. UPRC argues that payment was not actually received until one to three months after the month of production.

Under DOE's calculation methodology, the overcharge is deemed to occur during the month of sale and interest begins to accrue at the end of the month of sale (even if the overcharge occurred on the first day of the month). Payments to escrow are credited to the first day of the month in which payment is made (even if the payment was made on the last day of the month). DOE's computation methodology gives the oil producers a grace period of up to two months. UPRC seeks, in effect, a grace period much longer than the grace period given by the DOE in its computations.

■■■ As the court noted in its recent *Conoco* opinion, this court has given no other oil producer the benefit of a greater grace period. Restitution for overcharges should not hinge upon the specific accounting methods and billing practices of each individual oil producer. DOE's computations give UPRC a sufficient grace period to account for any delays in the actual receipt of payment.

UPRC's method of computing interest conflicts with settled precedent. TECA and this court have noted the importance of consistency and uniformity in price control cases. DOE's Policy Statement on Interest, 46 Fed. Reg. 21412 (1981) provides for interest from the date of violation to the date of restitution. TECA has held that the DOE's policy rates have a reasonable basis and serve the goal of uniformity. *Chevron v. DOE,* 944 F.2d 914, 916 (1991). This court has applied the DOE's policy rates in all the contested overcharge counterclaims brought by DOE. *E.g., Mobil v. DOE,* 722 F.Supp. 649, 659–61.

*Other Pending Motions*

Also pending before the court are the following: DOE's motion to strike UPRC's amended answers to fifth set of interrogatories (Doc. 2194); UPRC's motion for sequestration and refund of escrow account deposits (Doc. 2222); Coastal's motion for leave to file a memorandum as amicus curiae (Doc. 2224); UPRC's motion for leave to supplement the record regarding interest calculation issues (Doc. 2237).

Coastal's motion for leave to file an amicus brief is unopposed and shall be granted. The court has considered the arguments raised in Coastal's amicus brief, Doc. 2225.

UPRC's motion for sequestration and refund of escrow account deposits requests that the court sequester certain alleged overpayments made by UPRC to the escrow account. If the court denies DOE's motion for summary judgment, UPRC also seeks a refund of the sequestered overpayments. UPRC's motion is moot since UPRC's escrow account deposits have already been disbursed by the escrow account agent. Further, the court agrees with DOE's arguments (*see* Doc. 2232) that the Final Settlement Agreement bars the withdrawal of any funds by UPRC once paid in and disbursed. Finally, the motion is moot since the court is denying UPRC's motion for summary judgment.

UPRC's motion for leave to supplement the record regarding interest calculation issues shall be granted. The court has considered and rejects the arguments made by UPRC regarding the computation of interest. The court shall order prejudgment interest consistent with the court's prior rulings in this case.

Finally, the court addresses DOE's motion to strike UPRC's amended answers to interrogatories. In its original answers to Interrogatory 4 of the DOE's Fifth Set of Interrogatories, UPRC identified the Dover Unit as a property in which it held a working interest and which had been certified as stripper based on injection wells. In response to additional subparts of Interrogatory 4, UPRC responded that it did not have information as to sales volumes, regulatory tiers, and prices for oil produced from the

Dover Unit, and that it assumed that Exxon Company, USA, the operator, would possess such information.

UPRC has amended its answer to Interrogatory 4 to reflect that there are no properties in which it held a working interest which had been certified as stripper based on injection wells. DOE does not take issue with the amendment to this first aspect of Interrogatory 4. UPRC further amended its answer to Interrogatory 4 as follows, "Because UPRC has been unable to identify any property responsive to Interrogatory No. 4(a), the requests made in Interrogatory Nos. 4(b)(i)–(x) are inapplicable." DOE objects to this latter amendment, arguing that UPRC now seeks to back away from statements made ten years ago which are inconsistent with UPRC's current arguments. The court does not find striking the amended interrogatory answers to be necessary. The Dover Unit is not at issue in the present dispute.

*Conclusion*

The DOE has proven the existence of the overcharges it alleges occurred on the Arch Unit. Imposition of operator liability on UPRC is appropriate in this case. The settlement with Coastal and the adjudication of Sun's liability do not bar recovery from UPRC. The computational arguments raised by UPRC are without merit. Judgment shall be entered in favor of DOE with prejudgment interest at DOE's policy rates until the date of judgment, and post-judgment interest as allowed by statute.

**IT IS BY THE COURT THEREFORE ORDERED** that DOE's amended cross motion for summary judgment (Doc. 2229) is hereby granted.

**IT IS FURTHER ORDERED** that UPRC's motion for summary judgment (Doc. 2155) is hereby denied.

**IT IS FURTHER ORDERED** that UPRC's motion for sequestration of escrow account deposits (Doc. 2222) is hereby denied.

**IT IS FURTHER ORDERED** that Coastal's motion for leave to file an amicus brief (Doc. 2224) is hereby granted.

**IT IS FURTHER ORDERED** that UPRC's motion for leave to supplement the record regarding interest calculation issues (Doc. 2237) is hereby granted.

**IT IS FURTHER ORDERED** that DOE's motion to strike amended answers to fifth set of interrogatories (Doc. 2194) is hereby denied.

Counsel for the DOE shall prepare and submit the appropriate Journal Entry of Judgment within thirty (30) days of the date of this order.